[Cite as *S&T Bank, Inc. v. Advance Merchant Servs.*, 2024-Ohio-4757.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| S&T BANK, INC., | : | APPEAL NO. C-230448 |
| | | TRIAL NO. A-2102471 |
| Plaintiff-Appellant, | : | |
| | | |
| vs. | : | *O P I N I O N.* |
| | | |
| ADVANCE MERCHANT SERVICES, LLC, | : | |
| | | |
| GREEN CAPITAL FUNDING, LLC, | : | |
| | | |
| HIGH SPEED CAPITAL, LLC, | : | |
| | | |
| FUNDRY, LLC, | : | |
| | | |
| YELLOWSTONE CAPITAL, LLC, | : | |
| | | |
| JLEAK HOLDINGS, INC., | : | |
| | | |
| IOU FINANCIAL, INC., | : | |
| | | |
| ONEFUNDER, INC., | : | |
| | | |
| ROC FUNDING GROUP, LLC, | : | |
| | | |
| REGION CAPITAL, LLC, | : | |
| | | |
| BMF CAPITAL, LLC, | : | |
| | | |
| LIFETIME FUNDING, LLC, | : | |
| | | |
| CAPCALL, LLC, | : | |
| | | |
| 24 CAPITAL, | : | |
| | | |
| DIRECT CASH GROUP, INC., | : | |
| | | |
| WORLDWIDE CAPITAL MANAGEMENT, INC., | : | |
| | | |
| LRM CAPITAL, LLC, | : | |
| | | |
| REACT FUNDING, | : | |

| | |
|---|---|
| LLSV CORP., | : |
| BAYPOINT FUNDING, LLC, | : |
| MAIN STREET CAPITAL GROUP, LLC, | : |
| ADDY SOURCE LLC, | : |
| YES CAPITAL GROUP LLC, | : |
| SPG ADVANCE LLC, | : |
| APEX CAPITAL SOLUTIONS LLC, | : |
| EOM ADVANCE LLC, | : |
| DIESEL FUNDING LLC, | : |
| GREEN FUND OF MANHATTAN LLC, | : |
| BRIDGE FUNDING CAP LLC, d.b.a. BUSINESS FUND SOURCE, | : |
| KEY CAP FUND LLC, | : |
| YRB MCA INC., | : |
| KNIGHT CAPITAL FUNDING, LLC, | : |
| EIN CAP, INC., | : |
| and | : |
| QUEEN FUNDING, LLC, | : |
| Defendants-Appellees, | : |
| and | : |
| AVANZA CAPITAL, et al., | : |
| Defendants. | : |

Civil Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed in Part and Reversed in Part, and Cause Remanded

Date of Judgment Entry on Appeal: October 1, 2024

2

*McGuireWoods LLP*, *Jonathan Y. Ellis*, *Kathryn M. Barber*, *Grace Simmons*, *Jarrod D. Shaw*, *Shapero & Green LLC* and *Brian Green*, for Plaintiff-Appellant,

*Frost Brown Todd LLP*, *James C. Frooman*, *Kevin R. Carter* and *Nathaniel L. Truitt*, for Defendants-Appellees Addy Source LLC, YES Capital Group LLC, EOM Advance LLC, Apex Capital Solutions LLC, Diesel Funding LLC and SPG Advance LLC,

*Eastman & Smith Ltd.*, *Jared J. Lefevre* and *Claire M. Griffin*, for Defendants-Appellees BayPoint Funding, BMF Capital, LLC, CapCall, LLC, Direct Cash Group, Inc., IOU Financial, Inc., LLSV Corp., LRM Capital, LLC, Lifetime Funding, LLC, Main Street Capital Group, LLC, Onefunder, Inc., React Funding, Region Capital, LLC, ROC Funding Group, LLC, Worldwide Capital Management, Inc., and 24 Capital,

*Taft, Stettinius, & Hollister LLP*, *Russel S. Sayre* and *Chad R. Ziepfel*, for Defendant-Appellee Knight Capital Funding LLC,

*Durst Kerridge LLC*, *Alexander J. Durst* and *Paul R. Kerridge*, for Defendants-Appellees Green Fund of Manhattan LLC, YRB MCA Inc., Key Cap Fund LLC and Bridge Funding Cap LLC, d.b.a. Business Fund Source,

*Lindhorst & Dreidame*, *James F. Brockman* and *Zachary J. Rigg*, for Defendant-Appellee Queen Funding, LLC,

*Markovits, Stock & DeMarco, LLC*, *W.B. Markovits*, *Terence R. Coates* and *Dylan J. Gould*, for Defendant-Appellee EIN Cap, Inc.,

*Taft, Stettinius, & Hollister LLP*, *Glen R. McMurry* and *Jennifer D. Brumby*, for Defendants-Appellees Advance Merchant Services, Green Capital Funding LLC, High Speed Capital LLC, Fundry LLC, Yellowstone Capital LLC and JLeak Holdings, Inc.[1]

---

[1] We note that, although their counsel filed a notice of appearance in this appeal, these defendants-appellees did not file a brief in this matter.

3

**ZAYAS, Judge.**

{¶1} Plaintiff-appellant S&T Bank, Inc., ("S&T") appeals the judgment of the trial court dismissing its various claims against defendants-appellees, "a group of interrelated merchant cash advance" entities ("MCAs"). The claims against defendants-appellees Yellowstone Capital, LLC, ("Yellowstone") and Fundry, LLC, ("Fundry") were dismissed under Civ.R. 12(B)(2) for lack of personal jurisdiction. The claims against the remaining defendants-appellees ("the defendant MCAs") were dismissed under Civ.R. 12(B)(6) for failure to state a claim.

{¶2} The first issue this court is tasked with determining in this appeal is whether S&T's complaint sufficiently pleaded claims against the defendant MCAs for civil conspiracy and fraud. S&T argues the complaint adequately states a claim for civil conspiracy and fraud where it alleges that the defendant MCAs not only knowingly accepted fraudulently obtained funds from Harold Sosna, who obtained the funds unlawfully by kiting multimillion-dollar checks between certain bank accounts including an account at S&T, but continued to offer financing to Sosna, offering him greater sums of money with shorter repayment periods, to encourage the additional check kiting that would be required to repay the financing for their benefit. We hold that, when taking all the allegations in the complaint as true and making all reasonable inferences in favor of S&T, as we must do, we cannot say, as a matter of law, that S&T can prove no set of facts entitling it to relief on its civil-conspiracy and fraud claims. Therefore, we reverse the judgment of the trial court as to S&T's civil-conspiracy and fraud claims against all defendant MCAs, except defendants-appellees IOU Financial, Inc., Knight Capital Funding, LLC, Onefunder, Inc., and ROC Funding Group, LLC. For the reasons explained below, we affirm the judgment of the trial court as to S&T's civil-conspiracy and fraud claims against these excepted entities.

4

{¶3} The second issue we are tasked with determining in this appeal is whether the complaint sufficiently pleaded a claim against the defendant MCAs for inference with a contract. S&T argues that the complaint adequately states a claim for interference with a security agreement where, pursuant to the security agreement, S&T held a first-priority security interest in certain accounts and receivables that the defendant MCAs intentionally collected from despite knowledge of S&T's priority interest in such funds and without justification. We hold that these claims were properly dismissed where, regardless of whether the other elements of the claim were shown, S&T failed to adequately plead any resulting damages. Therefore, we affirm the judgment of the trial court dismissing S&T's interference-with-a-contract claims against the defendant MCAs.

{¶4} The final issue we are tasked with determining is whether the complaint established a prima facie showing of personal jurisdiction over Yellowstone and Fundry. S&T argues that the complaint established personal jurisdiction over Yellowstone and Fundry where it shows that Yellowstone and Fundry were alter egos of at least three defendant MCAs. We disagree and hold that the complaint failed to establish a prima facie showing of personal jurisdiction over Yellowstone or Fundry where there are no allegations in the complaint that would support that Yellowstone or Fundry transacted business in Ohio or caused tortious injury in Ohio, and no allegations that would support that Yellowstone or Fundry were simply alter egos of any of the other defendant MCAs. Therefore, we affirm the judgment of the trial court dismissing S&T's claims against Yellowstone and Fundry for lack of personal jurisdiction.

{¶5} Based on all the foregoing and as more adequately explained below, we affirm the judgment of the trial court in part and reverse the judgment of the trial court

5

in part, and remand the cause for further proceedings consistent with this opinion and the law.

### I. The Facts as Alleged in the Amended Complaint When Viewed in a Light Most Favorable to S&T

{¶6} Since 1998, Harold Sosna opened over a dozen healthcare facilities through various entities in which he is the principal agent. To operate these facilities, he held various bank accounts and had various banking relationships through his role in these entities. Around 2015, he began to aggressively expand his operations and obtained "tens of millions" of dollars in financing to do so from various "traditional banks," including S&T. As part of his agreement with S&T, he entered into a security agreement on behalf of two of his entities which granted S&T a security interest in certain specifically listed property of the entities, including all accounts and receivables in which the entities had or would acquire a right, as collateral.

{¶7} In August 2017, Sosna and his entities began experiencing significant "cash flow problems." Certain loans held with banks, other than S&T, were placed in "workout" and/or "default" and Sosna began seeking replacement financing. He was able to secure alternative financing in early 2018. Despite the alternative financing, the cash flow problems became "acute" later in 2018 and he began having difficulty making payroll. By that time, he could no longer obtain financing from traditional lenders because of the other defaults and financial difficulties.

{¶8} In danger of insolvency, Sosna began applying online for financing from MCAs around October or November 2018. Sosna and his attorney contacted a California-based broker, Caleb Wickman, who told Sosna that he could introduce him to companies (MCAs) "that offered 'non-traditional' financing to businesses that traditional banks would not," wherein payment would be advanced to the business for

6

purchase of its future accounts receivable until the repayment term was satisfied. In return, the business "remits a set percentage of its daily credit and debit card sales or an ACH deduction based upon a good faith estimate of future revenue, until the full amount of purchased revenue, plus any fees, has been paid in full" to the MCA.

{¶9} Sosna and his attorney obtained the information from Wickman and began applying for MCA financing. Once Sosna began working with the MCAs, he began to receive frequent texts, calls, and emails to his personal and business phone numbers and email accounts from various MCAs.

{¶10} According to records authored by Wickman, Sosna ultimately received over 48 million dollars in financing, through 94 respective instances of financing from various MCAs—including certain defendant MCAs—to various Sosna entities, from February 2019 to May 2020.

{¶11} Defendant-appellee 24 Capital provided $200,000 in financing on January 30, 2020, and $300,000 in financing on March 5, 2020. These instances of financing had a two-month repayment term, and 24 Capital allegedly received a total of $245,000 in interest from these transactions.

{¶12} Defendant-appellee Addy Source, LLC, provided $500,000 in financing on January 22, 2020, $400,000 in financing on February 7, 2020, and $400,000 in financing on February 28, 2020. These instances of financing had a two-month repayment term, and Addy Source allegedly received a total of $782,700 in interest from these transactions.

{¶13} Defendant-appellee Advance Merchant Services, LLC, ("AMS") provided $750,000 in financing on March 11, 2020. This instance of financing had a two-month repayment term, and AMS allegedly received $374,250 in interest from this transaction.

7

{¶14} Defendant-appellee Apex Capital Solutions, LLC, ("Apex") provided $750,000 in financing on March 11, 2020. This instance of financing had a two-month repayment term, and Apex allegedly received $149,750 in interest from this transaction.

{¶15} Defendant-appellee Baypoint Funding, LLC, ("Baypoint") provided $200,000 in financing on January 23, 2020. This instance of financing had a two-month repayment term, and Baypoint allegedly received $99,800 in interest from this transaction.

{¶16} Defendant-appellee BMF Capital, LLC, ("BMF") provided $300,000 in financing on January 30, 2020, $400,000 in financing on February 7, 2020, $1,200,000 in financing on February 14, 2020, $1,250,000 in financing on April 6, 2020, and $1,350,000 in financing on April 6, 2020. These instances of financing had a two-month repayment term, and BMF allegedly received $2,789,400 in interest from these transactions.

{¶17} Defendant-appellee Bridge Funding Cap LLC, d.b.a. Business Fund Source ("BFS") provided $500,000 in financing on February 27, 2020. This instance of financing had a two-month repayment term, and BFS allegedly received $250,000 in interest from this transaction.

{¶18} Defendant-appellee CapCall, LLC, provided $750,000 in financing on February 26, 2020, $250,000 in financing on March 4, 2020, $200,000 in financing on March 6, 2020, $250,000 in financing on March 13, 2020, $200,000 in financing on March 17, 2020, $200,000 in financing on March 23, 2020, $500,000 in financing on March 30, 2020, $225,000 in financing on April 2, 2020, $1,000,000 in financing on April 10, 2020, $1,000,000 in financing on April 16, 2020, $1,000,000 in financing on April 22, 2020, and $1,000,000 in financing on April 28, 2020. These instances of

financing had a two-month repayment term and CapCall allegedly received $3,281,425 in interest from these transactions.

{¶19} Defendant-appellee Diesel Funding, LLC, ("Diesel") provided $225,000 on March 13, 2020. This instance of financing had a two-month repayment term, and Diesel allegedly received $112,275 in interest from this transaction.

{¶20} Defendant-appellee Direct Cash Group, Inc., ("DCG") provided $500,000 in financing on December 30, 2019. This instance of financing had a three-month repayment term, and DCG allegedly received $199,500 in interest from this transaction.

{¶21} Defendant-appellee EIN Cap, Inc., ("EIN") provided $495,000 in financing on February 28, 2020. This instance of financing had a three-month repayment term, and EIN allegedly received $232,600 in interest from this transaction.

{¶22} Defendant-appellee EOM Advance, LLC, ("EOM") provided $250,000 in financing on February 28, 2020. This instance of financing had a two-month repayment term and EOM allegedly received $149,750 in interest from this transaction.

{¶23} Defendant-appellee Green Capital Funding, LLC, ("GCF") provided $600,000 in financing on February 5, 2020, $500,000 in financing on February 12, 2020, $500,000 in financing on February 28, 2020, $500,000 in financing on March 24, 2020, $750,000 in financing on April 7, 2020, and $700,000 in financing on April 22, 2020. These instances of financing had a two-month repayment term, and GCF allegedly received $1,771,450 in interest from these transactions.

{¶24} Defendant-appellee Green Fund of Manhattan, LLC, ("GFM") provided $1,050,000 in financing on March 5, 2020, $300,000 on March 9, 2020, and

$400,000 on April 2, 2020. These instances of financing had a two-month repayment term, and GFM allegedly received $1,050,000 in interest from these transactions.

{¶25} Defendant-appellee High Speed Capital, LLC, ("HSC") provided $500,000 in financing January 31, 2020. This instance of financing had a two-month repayment term, and HSC allegedly received $245,000 in interest from this transaction.

{¶26} Defendant-appellee IOU Financial, Inc., ("IOU") provided $400,000 in financing on February 22, 2019. This instance of financing had an 18-month repayment term, and IOU allegedly received $183,528 in interest from this transaction.

{¶27} Defendant-appellee JLeak Holdings, Inc., ("JLeak") provided $200,000 in financing on January 29, 2020. This instance of financing had a two-month repayment term, and JLeak allegedly received $99,800 in interest from this transaction.

{¶28} Defendant-appellee Key Cap Fund LLC ("Key Cap") provided $500,000 in financing on February 26, 2020. This instance of financing had a two-month repayment term, and KCF allegedly received $250,000 in interest from this transaction.

{¶29} Defendant-appellee Knight Capital Funding, LLC, ("Knight Capital") provided $350,000 in financing on August 29, 2019, and $250,000 in financing on October 21, 2019. The August instance of financing had a 9.2-month repayment term, and the October financing had an 8.5-month repayment term, and KCF allegedly received $212,500 in interest from these transactions.

{¶30} Defendant-appellee Lifetime Funding, LLC, ("Lifetime") provided $300,000 in financing on January 30, 2020. This instance of financing had a two-

month repayment term, and Lifetime allegedly received $149,700 in interest from this transaction.

{¶31} Defendant-appellee LLSV Corp. ("LLSV") provided $250,000 in financing on February 28, 2020. This instance of financing had a two-month repayment term, and LLSV allegedly received $149,750 in interest from this transaction.

{¶32} Defendant-appellee LRM Capital, LLC, ("LRM") provided $200,000 in financing on February 4, 2020, and $250,000 in financing on February 11, 2020. These instances of financing had a two-month repayment term, and LRM allegedly received $224,550 in interest from these transactions.

{¶33} Defendant-appellee Main Street Capital Group, LLC, ("Main Street") provided $1,000,000 in financing on February 13, 2020. This instance of financing had a two-month repayment term, and Main Street allegedly received $499,000 in interest from this transaction.

{¶34} Defendant-appellee OneFunder, Inc., provided $200,000 in financing on September 5, 2019. This instance of financing had a seven-month repayment term, and OneFunder allegedly received $88,000 in interest from this transaction.

{¶35} Defendant-appellee Queen Funding, LLC, provided $250,000 in financing on January 29, 2020, and Queen Funding allegedly received $124,750 in interest from this transaction.

{¶36} Defendant-appellee React Funding provided $150,000 in financing on February 12, 2020, and $250,000 in financing on March 6, 2020. These instances of financing had a two-month repayment term, and React Funding allegedly received $199,600 in interest from these transactions.

11

{¶37} Defendant-appellee Region Capital provided $450,000 in financing on January 22, 2020. This instance of financing had a two-month repayment term, and Region Capital allegedly received $224,550 in interest from this transaction.

{¶38} Defendant-appellee ROC Funding Group, LLC, ("ROC") provided $150,000 in financing on September 12, 2019. This instance of financing had a six-and-a-half-month repayment term, and ROC allegedly received $63,000 in interest from this transaction.

{¶39} Defendant-appellee SPG Advance LLC ("SPG") provided $250,000 in financing on January 30, 2020. This instance of financing had a two-month repayment term, and SPG allegedly received $139,750 in interest from this transaction.

{¶40} Defendant-appellee Worldwide Capital Management, Inc., ("WCM") provided $200,000 in financing on March 5, 2020, and $200,000 in financing on March 13, 2020. These instances of financing had a two-month repayment term, and WCM allegedly received $196,000 in interest from these transactions.

{¶41} Defendant-appellee Yes Capital Group, LLC, ("YCG") provided $425,000 in financing on January 23, 2020. This instance of financing had a two-month repayment term, and YCG allegedly received $237,575 in interest from this transaction.

{¶42} Defendant-appellee YRB MCA, Inc., ("YRB") provided $1,000,000 in financing on May 5, 2020. This instance of financing had a two-month repayment term, and YRB allegedly received $399,000 in interest from this transaction.

{¶43} As a condition of the financing, the defendant MCAs required that the financing be guaranteed by all the Sosna entities and "demanded absolute access to and control of all of Sosna's financial accounts." Sosna was required to provide his

personal login credentials for every bank account that he and the Sosna entities held and was required to give the MCAs full access to "every detail of the financial operations and transactions of Sosna and his entities." For example, the agreement between HSC and Sosna required that Sosna provide HSC or its agent with "all information, authorizations and passwords" necessary to verify a Sosna entity's receivables, receipts and deposits, and authorize HSC or its agent to deduct the daily installment payments from the "settlement amounts" which would otherwise be due to the Sosna entity.

{¶44} As permitted by the agreements, the defendant MCAs "kept and continued to use Sosna's bank login credentials to monitor all of his financial transactions throughout their MCA relationship." Further, the defendant MCAs shared information about Sosna and his entities via a shared online platform.

{¶45} Amid receiving the financing from the MCAs, the liquid assets of the Sosna entities were depleted and Sosna began kiting checks in October 2019 between various bank accounts held by the Sosna entities at "Huntington, Fifth Third, FFB, or S&T" to cover operating expenses. Sosna exploited the one-day "float" on certain accounts which allowed immediate access to deposited funds to continue his check-kiting scheme. As the scheme continued, the amount of funds that needed to be deposited every day to keep the scheme going increased dramatically. Eventually, Sosna was transferring millions of dollars every day between the certain accounts held at S&T, FFB, Fifth Third, and Huntington.

{¶46} "From their vantage point, given full access to all of Sosna's accounts across all financial institutions, [the defendant MCAs] were able to see all of these kiting transactions." Sosna continued to receive more offers of financing as "the kiting

scheme took off," but the MCAs began requiring shortened repayment periods with higher daily withdrawals once they learned of the check kiting.

{¶47} Sosna's payments to the MCAs reached as high as $93,750 daily, and some automatic payments did not clear due to insufficient funds. When payment was not received, "certain" defendant MCAs would threaten the life of Sosna, his family, or his attorney. These threats were made in an effort "to elicit payment and intimidate Sosna into obtaining the funds, regardless of the source or method." The defendant MCAs "repeatedly informed Sosna that they were closely monitoring all of Sosna's and the Sosna Entities' bank account history." They "spent considerable effort manually monitoring Sosna's banking history and ACH withdrawals, and even charged Sosna fees to compensate them for the expense of closely monitoring those transactions." One MCA agreement described the ACH withdrawal process as "labor intensive." Thus, the defendant MCAs "had superior knowledge to that of any other creditor, lender, or financial institution because [they] had access to every account in Sosna's control, not just those at a single financial institution or for a single entity."

{¶48} In the final stages of the kiting scheme, on May 15, 2020, Sosna deposited kited checks totaling $26,160,000 into a Sosna entity account at S&T. These checks were written against other Sosna entities' accounts and were ultimately dishonored by the drawing bank and S&T never received funds to cover these deposits. That same day, Sosna wrote checks against the S&T account to various Sosna entities in the aggregate amount of $26,040,000—wholly depleting that day's deposit into the account. S&T honored those checks, and the proceeds of those checks were deposited into accounts maintained by the Sosna entities at FFB.

{¶49} Then, on May 18, 2020, Sosna deposited a new set of kited checks, this time totaling $33,080,000, into the account at S&T. These checks were likewise

14

written against the other Sosna entities' accounts. These checks were ultimately dishonored by the drawing bank and S&T never received funds to cover these deposits. That same day, Sosna wrote checks against the S&T account to various Sosna entities in the aggregate amount of $33,115,000—wholly depleting that day's deposits. S&T honored those check and the proceeds of those checks were deposited into accounts maintained by the Sosna entities at FFB.

{¶50} For these May 15 and May 18 transactions, no funds came into the S&T accounts to cover the amounts withdrawn and honored by S&T. S&T never recovered these funds and suffered a $58 million loss.

## II. Procedural History

{¶51} S&T brought suit against Yellowstone, Fundry, and the defendant MCAs, asserting claims for civil conspiracy, fraud, conversion, unjust enrichment, violations of Ohio Corrupt Practices Act, and interference with a contract.

{¶52} Yellowstone and Fundry subsequently moved to dismiss the claims against them under Civ.R. 12(B)(2) for lack of personal jurisdiction, and the defendant MCAs respectively moved to dismiss the claims against them under Civ.R. 12(B)(6) for failure to state a claim. After responsive briefing and oral argument, the trial court granted the motions and dismissed S&T's complaint against Yellowstone, Fundry, and the defendant MCAs with prejudice.

{¶53} S&T now appeals the trial court's decision. In the first assignment of error, S&T challenges the trial court's finding that the amended complaint failed to state claims against the defendant MCAs for civil conspiracy, fraud, and interference with contractual relations. In the second assignment of error, S&T challenges the trial court's finding that it lacked personal jurisdiction over Yellowstone and Fundry.

### III. First Assignment of Error

**{¶54}** In its first assignment of error, S&T argues that the trial court erred in dismissing its complaint for failure to state claims for civil conspiracy, fraud, and interference with a contract.

### A. Standard of Review

**{¶55}** Ohio is a notice-pleading state. *Maternal Grandmother, ADMR v. Hamilton Cty. Dept. of Job and Family Servs.*, 2021-Ohio-4096, ¶ 10. Under this standard, a pleading must set forth a "short and plain statement of the claim showing that the party is entitled to relief." Civ.R. 8(A). This standard is different from the heightened federal plausibility standard of pleading, which has not been adopted by the Ohio Supreme Court. *See Maternal Grandmother* at ¶ 21-28 (Dewine, J., concurring in judgment only); *State ex rel. Ware v. Booth*, 2024-Ohio-2102, ¶ 5, fn. 1, citing *Maternal Grandmother* at ¶ 28. Thus, notice pleading does not require that the claim have "facial plausibility." *See Maternal Grandmother* at ¶ 27-28. Rather, a claim must "set forth only those operative facts sufficient to give 'fair notice of the nature of the action.'" *Ri'Chard v. Bank of Am.*, 2020-Ohio-4688, ¶ 8 (1st Dist.), citing *Wildi v. Hondros College*, 2009-Ohio-5205, ¶ 12 (10th Dist.).

**{¶56}** We review the dismissal of a complaint for failure to state a claim de novo. *Zalvin v. Ayers*, 2020-Ohio-4021, ¶ 13 (1st Dist.). "When considering a Civ.R. 12(B)(6) dismissal, the court must presume that all factual allegations in the complaint are true, and it must make all reasonable inferences in favor of the nonmoving party. It must then appear beyond doubt that the nonmoving party can prove no set of facts entitling it to the relief requested in the complaint." *Id.*, citing *Avery v. Rossford, Ohio Transp. Dist.*, 145 Ohio App.3d 155, 164 (6th Dist. 2001). "However, the court is not required to presume the truth of conclusions in the complaint unsupported by factual

16

allegations." *Id.*, citing *Guess v. Wilkinson*, 123 Ohio App.3d 430, 434 (10th Dist. 1997), *Swint v. Auld*, 2009-Ohio-6799, ¶ 3 (1st Dist.), and *Maternal Grandmother* at ¶ 21. Yet, "'as long as there is a set of facts, consistent with the plaintiff's complaint, which would allow the plaintiff to recover, the court may not grant a defendant's motion to dismiss.'" *Yeager v. U.S. Bank*, 2021-Ohio-1972, ¶ 10 (1st Dist.), quoting *York v. Ohio State Highway Patrol*, 60 Ohio St.3d 143, 144 (1991).

### B. Civil Conspiracy and Fraud Claims

**{¶57}** S&T first argues that the trial court erred in dismissing its civil-conspiracy and fraud claims where the complaint alleges the defendant MCAs not only accepted funds from Sosna knowing that they were fraudulently obtained but continued to offer financing to Sosna, offering him greater sums with shorter repayment periods, to encourage the additional kiting that would be required to repay the financing. In other words, S&T argues that the defendant MCAs conspired with Sosna to provide him with cash advances that would keep his check-kiting scheme afloat, and extract more fraudulently obtained funds to their benefit. Consequently, S&T argues that the defendant MCAs are liable for Sosna's fraud as coconspirators.

**{¶58}** "Conspiracy has been defined as a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages." *Lefort v. Century 21-Maitland Realty Co.*, 32 Ohio St.3d 121, 126 (1987), citing *Minarik v. Nagy*, 8 Ohio App.2d 194, 196 (8th Dist. 1963); *accord, e.g., Kenty v. Transamerica Premium Ins. Co.*, 72 Ohio St.3d 415, 419 (1995); *Williams v. Aetna Fin. Co.*, 83 Ohio St.3d 464, 475 (1998).

**{¶59}** "The element of 'malicious combination to injure' does not require a showing of an express agreement between defendants, but only a common understanding or design, even if tacit, to commit an unlawful act." *Gosden v. Louis*,

116 Ohio App.3d 195, 219 (9th Dist. 1996), citing *Pumphrey v. Quillen*, 102 Ohio App. 173, 177-178 (9th Dist. 1955). The parties coming to a mutual understanding, in any manner, to accomplish the unlawful design is sufficient. *Id.*, citing *Pumphrey* at 178.

{¶60} "The 'malice' in 'malicious combination' is legal or implied malice, 'which the law infers from or imputes from certain acts,' and is defined as 'that state of mind under which a person does a wrongful act purposely, without reasonable or lawful excuse, to the injury of another.'" *Id.* at 219-220, citing *Pickle v. Swinehart*, 170 Ohio St. 441, 443 (1960).

{¶61} "'In a way not competent for one alone' means that if one person could lawfully commit an act, then that act committed by two or more persons cannot support a conspiracy claim, no matter how malicious the 'conspirators,' or how great the resulting 'injury.'" *Id.* at 220, citing *Palmer v. Westmeyer*, 48 Ohio App.3d 296, 301 (6th Dist. 1988). "This element essentially states the rule that there must be an underlying unlawful act which is actionable in the absence of a conspiracy." *Id.* "It further points out that, in the civil conspiracy context, an otherwise lawful act is not made unlawful merely because two or more persons have joined together to commit it in hopes of causing injury to the plaintiff, even if they succeed." *Id.*, citing *Palmer* at 301.

{¶62} "The element of 'resulting in damages' means that, if a plaintiff suffers no actual damages from the underlying unlawful act, there can be no successful civil conspiracy action." *Gosden*, 116 Ohio App.3d at 220 (9th Dist.), citing *Minarik*, 8 Ohio App.2d at 195-196 (8th Dist.). The measure of recovery is "those damages caused by the underlying tort (or torts) necessary to support the claim." *Id.* There is no requirement for damages attributable to the conspiracy that are above and beyond those resulting from the underlying or supporting torts. *See id.* Rather, a civil-

18

conspiracy claim "serves only to enlarge the pool of potential defendants from whom a plaintiff may recover damages, and, possibly, an increase in the amount of those damages," based on a theory of aggravation. *Id.* at 221. "[I]t does not increase the plaintiff's burden by requiring proof of additional damages." *Id.*

{¶63} In *Kenty*, 72 Ohio St.3d 415, the plaintiff purchased a vehicle with the proceeds of a loan from Bank One, Columbus, N.A., ("Bank One Columbus") and executed a loan agreement that granted Bank One Columbus a security interest in the vehicle as collateral. *Id.* at 416. The plaintiff also executed a "Notice of Requirement to Provide Insurance" ("the insurance notice"), which required the plaintiff to provide property insurance against loss to the vehicle sufficient to cover the outstanding balance of the loan. *Id.* If the plaintiff failed to do so, the insurance notice provided that Bank One Columbus could purchase limited insurance—in the plaintiff's name and at the plaintiff's expense—for the protection of the bank in the amount of the plaintiff's loan and add the premiums for the insurance to the loan balance. *Id.* Upon the plaintiff's failure to purchase insurance, Bank One Columbus obtained insurance from an insurance company ("Transamerica") for four years and added the premiums to the plaintiff's loan balance. *Id.* The insurance included six coverages: conversion, mechanic's lien coverage, premium deficiency coverage, repossession expense coverage, repossessed vehicle coverage, and repossession storage expense coverage. *Id.* at 416-417.

{¶64} The plaintiff later filed a class action complaint against Bank One Corporation, Bank One Ohio Corporation, Bank One Wisconsin Insurance Service Corporation, and Transamerica Premier Insurance Services, Inc., (collectively referred to as "the defendants"). *Id.* at 417. The complaint first alleged that the defendants tortiously interfered with the contractual relationship between her and Bank One

Columbus, claiming that the entities had provided Bank One Columbus with insurance coverage that she did not purchase to add to the principal of her loan. *Id.* She alleged that, as a result, the premiums added to the principal of her loan exceeded the premiums she was obligated to pay for coverage under the insurance notice. *Id.* The assertion was that the defendants compelled her to pay for six coverages when the insurance notice only required her to pay for property insurance. *Id.* She further asserted that the defendants engaged in a scheme where Transamerica issued a certificate of insurance to her that listed an "artificially inflated price" for the coverages she was obligated to purchase as the price failed to deduct commission amounts paid by defendant Transamerica Premier Insurance Services to defendant Bank One Wisconsin Insurance for the purchase of the coverage by defendant Bank One Ohio, the holding company for Bank One Columbus. *Id.* The second count in the complaint alleged that, by charging her for six coverages and charging her premiums that failed to deduct the commissions received by Bank One Wisconsin Insurance, the defendants engaged in an unlawful civil conspiracy. *Id.*

{¶65} At the request of the defendants, the trial court dismissed the plaintiff's claims for failure to state a claim, and the court of appeals affirmed the dismissal. *Id.* However, on further appeal, the Ohio Supreme Court reversed the trial court's decision. *Id.* at 418-420. The court first held that the claim for tortious interference with a contract survived where, when taking the allegations as true, the breach of the contract by Bank One in overcharging for insurance coverage could have been induced by the defendants. *Id.* at 419. The court then addressed the civil-conspiracy claim and said:

[Plaintiff] claims that [defendants] conspired to charge her for the six coverages, which she did not authorize. [Plaintiff] also claims

20

that [defendants] conspired to conceal [the commission payments] that should have reduced the amount of premiums she was required to pay. [Plaintiff]'s complaint alleges that the statement of insurance to [her] by Transamerica did not disclose the proper premium that she should have paid. Finally, in the civil conspiracy count of her complaint, [plaintiff] alleged monetary damages as a result of [defendant]s' actions.

*Id.* The court held that these allegations, if true, "fulfill [the] definition of 'civil conspiracy' announced in *Lefort*[, 32 Ohio St.3d 121]." *Id.* at 420. Thus, the court held that the civil-conspiracy claim should not have been dismissed. *Id.*

{¶66} In *Williams*, 83 Ohio St.3d 464, Christopher Blair, a "pitchman who attempted to convince homeowners to have work done on their house," came to the plaintiff's home and told her that he noticed her home needed some repairs. *Id.* at 464-465. The plaintiff, a 66-year-old widow, initially responded that she was unable to get a loan to get the work done, but Blair later returned to her home and told the plaintiff that he could get her a loan to finance the improvements, even though she again expressed that she had been unable to get a loan for the repairs. *Id.* The plaintiff then signed a contract with Blair to have work done on both the interior and exterior of her home. *Id.* Subsequently, Blair's employees transported the plaintiff several times to the Loveland, Ohio, branch office of the defendant, Aetna Finance Company, d.b.a. ITT Financial Services ("ITT"), to obtain loans to finance the repairs. *Id.* Even though another branch office was closer to the plaintiff's home, "she was taken to the Loveland branch because Blair frequently referred prospective loan applicants to that branch." *Id.* The branch manager there had contacted Blair in 1988 seeking referrals of loan customers, and Blair was designated as a "referral source," which allowed

"preferential handling" of the loans for the customers he referred. *Id.* The plaintiff received several loans from ITT, with the final "larger loan" being secured by a mortgage on her real estate. *Id.* After Blair received the payments from the plaintiff, workers completed a small part of the agreed-upon repairs to her home, but the work done was not what the plaintiff wanted and most of the repairs were never completed. *Id.* The plaintiff attempted to call Blair several times, but never received a response. *Id.* The plaintiff made two payments to ITT but then stopped making payments when it became evident that the repairs would not be completed as agreed. *Id.*

{¶67} The plaintiff filed suit against ITT, claiming, among other things, fraudulent misrepresentation and civil conspiracy. *Id.* at 467. At trial, the plaintiff claimed that Blair and ITT collaborated in a scheme to defraud "unsuspecting and unsophisticated homeowners," where Blair did not really intend that the work contracted for would be completed and ITT supplied loans to the homeowners who entered into contracts with Blair so that Blair would receive the proceeds of the loan. *Id.* at 468. The plaintiff claimed that "ITT benefited by making high-interest, low-risk, secured loans and exploited the unsuspecting homeowners, while ITT knew that the work contracted for with Blair would never be done." *Id.* "To support her claims, [the plaintiff] presented the testimony of other homeowners who explained their dealings with Blair and ITT. Testimony was also elicited from Blair and from former employees of ITT by [the plaintiff] to sustain her position." *Id.*

> [The plaintiff] presented her situation as typical of a scheme Blair pitched to the homeowners, put on testimony to support her argument that she was targeted by ITT and Blair, and urged through the witnesses presented that she and other homeowners had been victimized by ITT's two-step loan process, whereby ITT first made a

small personal loan and then shortly after replaced it with a second large home equity loan, generating extra closing costs and fees. [The plaintiff] presented circumstantial evidence in an attempt to have the jury draw inferences built on her allegations that ITT made the loan to her with the knowledge that her monthly income was insufficient to make the monthly payments required, and that ITT may have planned to foreclose if she did not make the payments.

[The plaintiff] also presented several witnesses who testified that ITT employees were accepting payments directly from Blair to cover loan payments not being made by his home improvement customers whose work was not being done, to show that ITT employees were aware that the work Blair had solicited was not being completed. Several witnesses testified to the close relationship Blair had with several ITT loan officers, including the branch manager at the ITT Loveland branch where [the plaintiff] obtained her loans. Testimony was also presented that the term "Blair loan" had taken on a special meaning at several ITT offices prior to the time [the plaintiff] dealt with ITT, to indicate the peculiar type of problem loans being made to Blair's customers. In addition, an attorney who represented some dissatisfied customers of Blair testified that he had filed a lawsuit against Blair and ITT, among others, [prior to Blair coming to the plaintiff's home], and had won a default judgment.

*Id.*

**{¶68}** The jury ultimately found in favor of the plaintiff and the trial court denied ITT's subsequent attempts to obtain a judgment notwithstanding the verdict.

*Id.* at 469. On appeal, the propriety of the civil-conspiracy theory of recovery eventually came before the Ohio Supreme Court. *Id.* at 470. The Ohio Supreme Court held that the jury reasonably determined, based on the evidence, that ITT employees conspired with Blair to defraud the plaintiff. *Id.* at 476. The court reasoned:

> ITT's role in the conspiracy was to allow Blair to have access to loan money that was necessary to further his fraudulent actions against customers such as [the plaintiff.] Thus, ITT employees themselves affirmatively committed fraud by the very acts of making the loans to [the plaintiff] and others.
>
> In particular, the testimony of former ITT branch manager and regional manager Jeffrey Stires supported [the plaintiff]'s claims that ITT employees conspired with Blair. Stires testified that Blair's financial problems were well known among ITT employees a significant time before the loan was made to [the plaintiff], and that the term 'Blair loan' had developed a specific, highly negative connotation among employees of ITT. In addition, Stires and others testified to the close relationship between Blair and ITT's employees.

*Id.*

**{¶69}** *Kenty*, 72 Ohio St.3d 415, and *Williams*, 83 Ohio St.3d 464, are indicative of the type of agreement that is sufficient to prevail on a civil-conspiracy claim in Ohio. They demonstrate that an "[e]xpress agreement is not necessary, and all that is required is that there should be common design or understanding, even though it be a tacit one." (Citation omitted.) *Pumphrey*, 102 Ohio App. at 177-178 (9th Dist.). Thus, "'[a]ll those who, in pursuance of a common plan or design to commit a tortious act, actively take part in it, or further it by cooperation or request,

or who lend aid or encouragement to the wrongdoer, or ratify and adopt the wrongdoer's act done for their benefit, are equally liable.'" *Meehan v. Mardis*, 2019-Ohio-4075, ¶ 47 (1st Dist.), quoting *Williams* at 476; *accord Pumphrey* at 177.

**{¶70}** *Kenty* and *Williams* are also indicative that the evidence of an agreement does not have to be direct. Rather, it is sufficient if the evidence supports a reasonable inference that an agreement was made.

**{¶71}** "The ultimate fact of conspiracy is solely a question for the jury, unless the court can say, as a matter of law, that there is no proof tending to establish a conspiracy." *Lefort*, 32 Ohio St.3d at 126, citing *Liston v. Statler*, 9 Ohio App. 398, 491 (9th Dist. 1917).

**{¶72}** Here, the underlying tort alleged by the plaintiff is the check-kiting fraud committed by Sosna. Sosna's fraud is established in the complaint—him having admitted and pled guilty to felony bank fraud in other proceedings—and is not in question. The only question before this court is whether any of the MCAs can also be held liable for his fraudulent acts. "In a conspiracy, the acts of the coconspirators are attributable to each other." *Meehan*, 2019-Ohio-4075, at ¶ 47 (1st Dist.), citing *Williams*, 83 Ohio St.3d at 476. Therefore, the question this court must decide is whether the complaint sufficiently pleaded a conspiracy between Sosna and the MCAs to defraud S&T.

**{¶73}** According to the complaint, the defendant MCAs operate collectively to target potential borrowers and, in doing so, share information regarding the borrowers through common employees or agents and/or a shared online platform. As a result, once Sosna applied for financing from a specific MCA, he then received frequent communications from various other MCAs, and "each caller appeared to have the specific information that he had just provided to a single MCA on a platform." He

was "contacted by several MCAs that knew his transaction history and the details of any offers he had already been given, which would not be available but for receiving the information through the platform on which Sosna applied or though the MCA through which he had procured funding." In fact, Sosna's agreements with the MCAs expressly authorized such information sharing.

{¶74} Further, the defendant MCAs contractually had full access to "every detail" of Sosna's financial operations and transactions and were allegedly "acutely aware" of his financial situation and "intensely scrutinized" the finances of the Sosna entities, "including checking past transactions, revenue streams, and daily balances prior to making an advancement decision."

{¶75} As his financial conditioned worsened, Sosna became "increasingly inundated" with communications from various MCAs "aggressively offering" financing at higher rates than before and in larger amounts. On one occasion, Sosna attempted to conceal from AMS, GCF, and HSC certain financing that he had received from other MCAs and was confronted by a common employee of AMS, GCF, and HSC who informed Sosna that he had learned of the hidden financing from the other MCAs through the online platform. Thus, it is clear from the allegations in the complaint that the defendant MCAs used the online platform to share information about Sosna and his entities before and after he contracted with an MCA for financing.

{¶76} Further, as a part of the financing, the defendant MCAs continually monitored, at a "considerable effort," all of Sosna's financial transactions throughout their relationship. On one occasion, an employee of CapCall even complimented Sosna "on the fact that the revenue stream for one entity grew from approximately $600,000 to $6 million in a matter of weeks," despite this being an observation that would give any reasonable person pause.

**{¶77}** Yet, despite the alleged information sharing, ongoing monitoring, and knowledge of Sosna's financial situation, a majority of the 94 alleged instances of financing to the Sosna entities by the MCAs occurred after the Sosna entities allegedly became insolvent and Sosna began unlawfully kiting checks. The repayment terms for the financing just substantially shortened after the check kiting began, going from an 18-month repayment term in February 2019 to a three-month repayment period by the end of 2019 and a two-month repayment period for most of 2020.

**{¶78}** Taking the allegations in the complaint as true, as we must, and making all reasonable inferences in favor of S&T, the complaint establishes that the defendant MCAs provided financing to Sosna despite knowledge of the insolvency of the Sosna entities and despite knowledge that Sosna was kiting checks daily between the various bank accounts of the Sosna entities—including the account held at S&T—to cover operating expenses.

**{¶79}** If, as alleged, the defendant MCAs in fact continued to advance substantial sums of money to the Sosna entities, despite this knowledge, only with shorter repayment periods and higher daily withdrawal requirements, then a reasonable inference arises that the defendant MCAs provided the funding with the knowledge and understanding that they would be repaid with funds fraudulently obtained from S&T and the other banks. Such acts in furtherance of Sosna's fraudulent acts are sufficient to show a tacit agreement to the fraud for their benefit, and any such agreement meets the definition of a civil conspiracy in Ohio.

**{¶80}** Consequently, based on the facts alleged in the complaint, which this court must take as true at this point in the case, we cannot say, as a matter of law, that S&T can prove no set of facts entitling it to relief on its civil-conspiracy and fraud claims.

27

**{¶81}** However, because this holding is dependent upon actual knowledge of the insolvency and the kiting activity, which was the underlying unlawful act for the conspiracy, we limit our holding to only those defendant MCAs that allegedly provided financing to the Sosna entities after the check-kiting scheme was underway. Consequently, this holding does not apply to IOU, Knight Capital, Onefunder, or ROC. Accordingly, we sustain the first assignment of error in part as to the civil-conspiracy and fraud claims against all defendant MCAs except IOU, Knight Capital, Onefunder, and ROC, but overrule the first assignment of error in part as to the civil-conspiracy and fraud claims against IOU, Knight Capital Onefunder, and ROC.

### C. Interference with a Contract

**{¶82}** A plaintiff must prove the following elements to establish a claim for interference with a business relationship or contract:

(1) the existence of a business relationship or contract, (2) the defendant's knowledge of the business relationship or contract, (3) the defendant's intentional or improper action taken to prevent a contract formation, procure a contract's breach, or terminate a business relationship, (4) lack of justification or privilege, and (5) resulting damages.

(Citations omitted.) *Beck v. Cardinal Health, Inc.*, 2021-Ohio-3804, ¶ 27 (10th Dist.).

**{¶83}** S&T's interference-with-a-contract claim asserts that the defendant MCAs interfered with the security interest it held in certain accounts and receivables under a security agreement.

**{¶84}** The complaint alleges that, in May 2015, Sosna secured financing from S&T by entering into three agreements: a construction loan agreement, a line-of-credit loan note, and a security agreement. These agreements, which were attached and

incorporated into the complaint, were entered by and between S&T and F&H Realty Holding Company, LLC, ("F&H") and Huffman Healthcare, Inc., ("Huffman"). Sosna entered into the agreements through his role as managing member of F&H and president of Huffman.

**{¶85}** Among other things, the security agreement provided that, to secure payment under the construction loan agreement and the line-of-credit loan note ("the other agreements"), S&T was granted a security interest in certain specifically listed property, including all accounts and receivables in which F&H or Huffman had or would acquire a right, as collateral. The security agreement required that F&H and Huffman maintain the priority of the security interests granted by the security agreement and prohibited F&H or Huffman from selling, conveying, assigning, transferring, or otherwise disposing of any collateral without prior written consent of S&T.

**{¶86}** S&T argues that it sufficiently pleaded a claim for interference with the security agreement where it alleged that the defendant MCAs had knowledge of S&T's interest in F&H's and Huffman's accounts and receivables under the security agreement yet proceeded to "purchase" and collect from the Sosna entities' accounts and receivables thus depleting his entities' liquid assets and interfering with its security interest.

**{¶87}** However, regardless of whether all the other elements of the claim are met, we fail to see any adequate allegation of damages suffered by the alleged interference with the security agreement. Notably, the security agreement was entered for the purpose of securing payment under the other agreements and there is no allegation in the complaint that payment was not made on the other agreements, and, even if there was, there is no allegation that S&T was unable to recover what it is owed

29

under the other agreements from the other specifically listed property in which it held a security interest under the security agreement.

{¶88} S&T argues that it suffered damages because the value of its security interest was reduced. However, S&T must allege damage beyond just the decreased value of its security interest. *See generally RFC Capital Corp. v. Earthlink, Inc.*, 2004-Ohio-7046, ¶ 72 (10th Dist.) (stating that Ohio recognizes a claim for impairment of a security interest but establishing that, to recover, a party must show the defendant's actions lessened the value of the security interest *and* resulting damages). Because it failed to do so, we hold that the trial court properly dismissed its claims for interference with a contract as, regardless of whether the other elements of the claim are met, S&T failed to adequately plead damages. Consequently, we overrule the first assignment of error in part as to these claims and affirm the judgment of the trial court regarding S&T's claims for interference with a contract.

## IV. Second Assignment of Error

{¶89} In its second assignment of error, S&T argues that the trial court erred in dismissing its complaint against Yellowstone and Fundry for lack of personal jurisdiction.

{¶90} "'Personal jurisdiction is a question of law that appellate courts review de novo.'" *Ricker v. Mercedes-Benz of Georgetown*, 2022-Ohio-1860, ¶ 11 (10th Dist.), quoting *Kauffman Racing Equip. L.L.C. v. Roberts*, 2010-Ohio-2551, ¶ 27. "When a defendant files a Civ.R. 12(B)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing that the trial court has personal jurisdiction over the defendant." *Id.*, citing *Kauffman*.

{¶91} "If the court determines a motion to dismiss for lack of personal jurisdiction without an evidentiary hearing, 'the plaintiff need only establish a prima

facie showing of personal jurisdiction, which requires sufficient evidence to allow reasonable minds to conclude that the trial court has personal jurisdiction.'" *Id*. at ¶ 12, quoting *Austin Miller Am. Antiques, Inc. v. Cavallaro*, 2011-Ohio-6670, ¶ 7 (10th Dist.). "In the absence of an evidentiary hearing on a motion to dismiss for lack of personal jurisdiction, 'the court must view the allegations in the pleadings and the evidence in the light most favorable to the plaintiff and make all reasonable inferences in the plaintiff's favor.'" *Id.*, quoting *Simmons v. Budde*, 2015-Ohio-3780, ¶ 7 (10th Dist.). "If a plaintiff produces sufficient evidence to allow reasonable minds to conclude the trial court has personal jurisdiction over a defendant, 'then the trial court could not dismiss the complaint without holding an evidentiary hearing.'" *Id.*, quoting *Benjamin v. KPMG Barbados*, 2005-Ohio-1959, ¶ 27 (10th Dist.).

**{¶92}** "To determine whether Ohio has personal jurisdiction over a nonresident defendant, a court must engage in a two-step analysis." (Citations omitted.) *Id*. at ¶ 13. "First, the court must determine whether Ohio's long-arm statute and applicable Civil Rule confer personal jurisdiction over the nonresident defendant." *Id*. at ¶ 13, citing *Goldstein v. Christiansen*, 70 Ohio St.3d 232, 235 (1994). "Second, if the statute and rule confer jurisdiction, the court must determine whether exercising jurisdiction comports with the nonresident defendant's right to due process of law pursuant to the Fourteenth Amendment to the United States Constitution." *Id.*, citing *Goldstein* at 235.

**{¶93}** "Ohio's long arm statute, R.C. 2307.382, and the complementary Civil Rule, Civ.R. 4.3, authorize a court to exercise personal jurisdiction over a nonresident defendant, and provide for service of process to effectuate that jurisdiction, when the cause of action arises from the nonresident '[t]ransacting any business in this state.'" *Ricker*, 2022-Ohio-1860, at ¶ 14 (10th Dist.), citing R.C. 2307.382(A)(1), Civ.R.

31

4.3(A)(1) and *Goldstein* at 235. The long-arm statute also authorizes a court to exercise personal jurisdiction over a nonresident defendant that causes tortious injury by an act or omission in this state. R.C. 2307.382.

{¶94} After reviewing the specific allegations against Yellowstone and Fundry in the complaint and the exhibits attached in support, the allegations, at most, establish that certain MCAs have acted as agents or in concert with Yellowstone and Fundry when providing certain—*not all*—unspecified financing, and that Yellowstone operated at one point in time at an address affiliated with EIN. Importantly, there are *no* allegations that Yellowstone or Fundry were involved in any of the financing advanced to Sosna in Ohio, or any allegations that would connect any of the actions of Yellowstone or Fundry to Ohio in any way. Further, the allegations in the complaint do not show that any of the defendant MCAs were acting under the complete control of Yellowstone or Fundry when they transacted business in Ohio or that Yellowstone or Fundry are "fundamentally indistinguishable" or alter egos of any of the defendant MCAs.

{¶95} Consequently, we hold that the trial court correctly dismissed the claims against Yellowstone and Fundry for lack of personal jurisdiction as there are no allegations in the complaint that would support that Yellowstone or Fundry transacted business in this state or caused tortious injury in this state. Accordingly, we overrule the second assignment of error and affirm the judgment of the trial court as to Yellowstone and Fundry.

### V. Conclusion

{¶96} We sustain the first assignment of error in part as to the civil-conspiracy and fraud claims against all defendant MCAs except defendants-appellees IOU, Knight Capital, Onefunder, and ROC. We overrule the first assignment of error in part as to

32

the civil-conspiracy and fraud claims against IOU, Knight Capital, Onefunder, and ROC, and as to the interference-with-a contract claims against all defendant MCAs. Additionally, we overrule the second assignment of error. Consequently, the judgment of the trial court in affirmed in part and reversed in part, and the cause is remanded for further proceedings consistent with this opinion and the law.

Judgment accordingly.

**BOCK, P.J.,** and **WINKLER, J.,** concur.

Please note:

The court has recorded its own entry this date.