[Cite as *Bruns v. Adlard*, 2025-Ohio-5202.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| ANTHONY J. BRUNS, as guardian for Caroline Sue Bruns, | : | APPEAL NO. C-240636 |
| | | TRIAL NO. A-2201103 |
| and | : | |
| JANET FRANZ, | : | |
| Plaintiffs-Appellants, | : | *JUDGMENT ENTRY* |
| vs. | : | |
| CAROLE ADLARD, | : | |
| and | : | |
| HEALTHY VISIONS, f.k.a. Adoption Option, Inc., | : | |
| Defendants-Appellees, | : | |
| and | : | |
| DMEAD LLC, | : | |
| Defendant. | : | |

This cause was heard upon the appeal, the record, the briefs, and arguments.

For the reasons set forth in the Opinion filed this date, the judgment of the trial court is affirmed in part and reversed in part, and the cause is remanded.

Further, the court holds that there were reasonable grounds for this appeal, allows no penalty, and orders that costs be taxed 50 percent to the appellants and 50 percent to the appellees.

The court further orders that (1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and (2) the mandate be sent to the trial court for execution under App.R. 27.

**To the clerk:**

**Enter upon the journal of the court on 11/19/2025 per order of the court.**

## OHIO FIRST DISTRICT COURT OF APPEALS

By:_____
    **Administrative Judge**

[Cite as *Bruns v. Adlard*, 2025-Ohio-5202.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

ANTHONY J. BRUNS, as guardian for Caroline Sue Bruns,

and

JANET FRANZ,

Plaintiffs-Appellants,

vs.

CAROLE ADLARD,

and

HEALTHY VISIONS, f.k.a. Adoption Option, Inc.,

Defendants-Appellees,

and

DMEAD LLC,

Defendant.

APPEAL NO. C-240636
TRIAL NO. A-2201103

*O P I N I O N*

Civil Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed in Part, Reversed in Part, and Cause Remanded

Date of Judgment Entry on Appeal: November 19, 2025

*Blessing & Wallace Law LLC*, *William H. Blessing* and *Angela L. Wallace*, for Plaintiffs-Appellants,

*Keating Muething & Klekamp PLL*, *Michael L. Scheier*, *Andrew B. Barras* and *Jacob D. Rhode*, for Defendants-Appellees.

**ZAYAS, Presiding Judge.**

{¶1} Plaintiffs-appellants Anthony Bruns, as guardian for Caroline Sue Bruns ("Anthony"), and Janet Franz ("Janet") (collectively referred to as "plaintiffs") appeal from the judgment of the Hamilton County Court of Common Pleas granting summary judgment in favor of defendants-appellees Carole Adlard ("Carole") and Healthy Visions, f.k.a Adoption Option, Inc., ("Healthy Visions") (collectively referred to as "defendants") on their claims for conversion, intentional infliction of emotional distress ("IIED"), conspiracy, and unjust enrichment.

{¶2} Raising four assignments of error, plaintiffs-appellants challenge the trial court's grant of summary judgment on each of their claims. For the reasons that follow, we sustain the first assignment of error in part as to Anthony's conversion claim against Carole for money taken from Caroline Sue Bruns's bedroom in 2021, sustain the second assignment of error in part as to Anthony's conspiracy claim against Carole that is derivative of the bedroom-money-conversion claim, sustain the fourth assignment of error in part as to Anthony's claim against Carole for IIED, and overrule the remaining parts of the first, second, and fourth assignments of error along with the third assignment of error.

## I. Initiation of the Proceedings

{¶3} Plaintiffs initiated this action against defendants, asserting claims for conversion, IIED, and conspiracy against Carole, and conversion and unjust enrichment against Healthy Visions.[1]

{¶4} In the amended complaint, plaintiffs allege that Carole, who was married to Caroline Sue Bruns's brother Ed, solicited and organized a "prayer group,"

---

[1] DMEAD, LLC, was also listed as a defendant; however, DMEAD was voluntarily dismissed from the action in May 2024.

4

through which she used "well-recognized emotional and psychological techniques to dominate and control Prayer Group members' lives," including by claiming to have received "divine visions and commands" as "a person sent to earth as the embodiment of Mary, the 'Queen of Heaven' and mother of Jesus." The complaint claims that Caroline Sue Bruns ("Sue") and her late husband, Ned, (collectively referred to as "the Brunses") were Carole's "main target." In summary, the complaint asserts that Carole manipulated Sue both psychologically and financially, using her religious connections and personal influence, and targeted the Brunses because of their personal wealth, sincere religious devotion and faithfulness to the Catholic Church, history of generosity, and community status.

{¶5} The conversion claim asserts that defendants are liable to "plaintiff" for conversion where, "[b]eginning in 2009, and continuing through February 22, 2021, Defendant [Carole], acting directly and through her agents, wrongfully exercised dominion and control over [the Brunses'] assets, namely cash and valuable coins, and used those funds for the benefit of herself, Defendant Healthy Visions, which she controls, . . . and her immediate family members." The claim further asserts that "[d]emand for return of the converted property has been made, but [Carole] has returned only $40,000 of the converted cash and certain valuable coins."

{¶6} The IIED claim asserts that Carole is liable "to each of the Plaintiffs" for IIED where she "intended to cause serious emotional distress to each of the Plaintiffs," and engaged in extreme and outrageous conduct by, among other things (1) recruiting the Brunses to join her "divine project," (2) sharing her "mystic readings" about conversations with "the Creator" and urging the Brunses to distance themselves from their family and accept that their wealth was not their own, (3) using her "professional training" to identify the Brunses' vulnerabilities and induce them into an "altered state

5

of consciousness" in which she could emotionally and financially manipulate them, (4) using her claimed religious authority and her psychological techniques to dominate and control the wills of the Brunses and "publish false and fraudulent representations to them," (5) conveying "divine commands" for the Brunses to fund Carole's personal vacations, purchase "entertainment assets" for Carole, fund Healthy Visions, fund Carole's son's college education, and "numerous other emoluments," (6) using "spiritual authority" to dominate the Brunses and induce them to separate from other family members and reject standard medical care, (7) using her authority to "abuse," intimidate, and "browbeat" the Brunses, (8) inducing Sue to access her bank accounts and withdraw $354,000 from "mid-2020 until early 2021," which was ultimately "seized and pocketed by [Carole] who distributed some of the funds to other Prayer Group members," and (9) in "mid-to-late 2021," taking the balance of Sue's money that she had withdrawn.

{¶7} The conspiracy claim asserts that Carole is liable to "Plaintiffs" for conspiracy where she "engaged in a malicious combination, conspiracy, and converted behavior with Joseph Fussner, MaryAnne Scheuble, and others to perpetrate, promote, ratify, and execute the conduct described" in the complaint. The conspiracy claim further asserts, "In carrying out the conspiracy, the Defendants violated Ohio and Kentucky laws prohibiting theft by deception."

{¶8} The unjust-enrichment claim asserts that Healthy Visions has "been unjustly enriched as a direct result of the conduct by [Carole]," and the "sums by which these defendants have been unjustly enriched need to be determined during discovery and must be disgorged from [Healthy Visions] and returned to [AB]." The relief requested on this claim is "an equitable order, disgorging all ill-gotten gains and receipts that . . . Healthy Visions ha[s] received by reason of the wrongful conduct

described" in the complaint.

**{¶9}** The amended complaint also requests punitive damages against Carole "in an amount sufficient to punish her for her wrongful conduct and deter her and others from engaging in such conduct," as well as costs and attorney fees.

## II. Summary Judgment

**{¶10}** After discovery, defendants filed a four-part, over-1500-page motion for summary judgment, inclusive of numerous exhibits attached to the motion, seeking judgment in their favor on all claims. The motion claimed that the case was a "misguided" effort to hold defendants liable for Sue's "unusual—but entirely voluntary—lifestyle and spending habits." The motion argued that "some of these claims are legally deficient, and others fail because Plaintiffs did not develop sufficient evidence to create a genuine issue of material fact for a jury to decide."

**{¶11}** Plaintiffs responded in opposition to summary judgment, filing six depositions in the record and attaching numerous exhibits to their motion in opposition. The motion asserted, "The [summary-judgment] motion rests almost exclusively on a sanitized, lawyer-authored narrative, along with several deposition statements from the principal defendant, Carole Adlard. Defendants' narrative fails to meet the Civ.R. 56 standard, as it takes statements and testimony out of context and relies (nearly exclusively) on disputed assertions."

**{¶12}** Defendants thereafter filed a reply in support of summary judgment. The motion asserted that plaintiffs "spend over three-fourths of their brief parroting the same lawyer-created, salacious narrative in the Amended Complaint about this familial dispute and Defendant Carole Adlard . . . . But we are past the pleading stage, and none of their allegations proved true after a full opportunity for discovery, nor have they connected any of that unproven conduct to their narrow tort claims."

7

**{¶13}** Ultimately, in October 2024, the trial court granted summary judgment in favor of defendants on all claims.

**{¶14}** Plaintiffs now appeal, raising four assignments of error for this court's review. The four assignments of error are essentially separate challenges to the trial court's grant of summary judgment on each of their four claims. The first assignment of error argues that the trial court erred in granting summary judgment on the conversion claims. The second assignment of error argues that the trial court erred "in granting summary judgment and dismissing the civil conspiracy claims by misapplying fundamental principles of civil conspiracy law and improperly engaging in fact-finding." The third assignment of error argues that the trial court erred in granting summary judgment and dismissing the claim for unjust enrichment. The fourth assignment of error argues that the trial court erred in granting summary judgment on the claims for IIED.

### III.  Law and Analysis

### A.  Standard of Review

**{¶15}** "This court reviews a trial court's grant of summary judgment de novo." *Environmental Solutions & Innovations, Inc. v. Edge Eng. & Science, LLC*, 2023-Ohio-2605, ¶ 6 (1st Dist.), citing *Mid-Century Ins. Co. v. Stites*, 2021-Ohio-3839, ¶ 10 (1st Dist.). "Summary judgment should be rendered in the [moving] party's favor if the timely filed Civ.R. 56(C) permissible evidence shows that there is no genuine issue of material fact, and the nonmoving party is entitled to judgment as a matter of law." *Id.*, citing Civ.R. 56(C). "Summary judgment 'shall not be rendered unless it appears from the evidence or stipulation, and only from the evidence or stipulation, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made.'" *Id.*, citing Civ.R.

56(C).

**{¶16}** "In other words, to obtain summary judgment, the moving party must show that (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) it appears from the evidence that reasonable minds can come to but one conclusion when reviewing the evidence in favor of the nonmoving party, and that conclusion is adverse to the nonmoving party." *Id.* at ¶ 7, citing *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105 (1996). "The moving party has the initial burden of informing the trial court of the basis for the party's motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential elements of the nonmoving party's claim." *Id.*, citing *Dresher v. Burt*, 76 Ohio St.3d 280, 293 (1996). "If the moving party meets this initial burden, the nonmoving party then bears the burden of setting forth 'specific facts showing that there is no genuine issue for trial.'" *Id.*, citing Civ.R. 56(E). "If the nonmoving party does not do so, then summary judgment is appropriate and must be entered against the nonmoving party." *Id.*, citing Civ.R. 56(E).

**{¶17}** "Because the trial court must construe the evidence in the light most favorable to the nonmoving party when ruling on a summary-judgment motion, all competing inferences and questions of credibility must be resolved in favor of the nonmoving party." *Environmental Solutions*, 2023-Ohio-2605, at ¶ 8 (1st Dist.), citing *Appellant v. Alpha Phi Alpha Homes, Inc.*, 2019-Ohio-960, ¶ 9 (9th Dist.). "The trial court is prohibited from weighing the evidence or choosing among reasonable inferences at the summary-judgment stage." *Id.*, citing *Alpha Phi* at ¶ 9. "The purpose of summary judgment 'is not to try issues of fact, but rather to determine whether triable issues of fact exist.'" *Id.*, citing *Walker v. Hodge*, 2008-Ohio-6828, ¶ 19 (1st Dist.). "Thus, if reasonable minds could reach different conclusions based on the

9

evidence, then summary judgment should be denied, and the matter should proceed to trial." *Id.*

### B. First Assignment of Error

**{¶18}** Under the first assignment of error, Anthony challenges the trial court's grant of summary judgment on his conversion claims.[2] He asserts that the trial court erred in its determinations on these claims where it ignored detailed eyewitness testimony about specific acts of conversion and improperly weighed the evidence.

**{¶19}** "Conversion is the wrongful exercise of dominion over property to the exclusion of the rights of the owner, or withholding it from his possession under a claim inconsistent with his rights." *Kodu v. Medarametla*, 2016-Ohio-8020, ¶ 22 (1st Dist.), citing *Joyce v. Gen. Motors Corp.*, 49 Ohio St.3d 93, 96 (1990).

**{¶20}** "'The elements of a conversion cause of action are: (1) plaintiff's ownership or right to possession of the property at the time of the conversion; (2) defendant's conversion by a wrongful act or disposition of plaintiff's property rights; and (3) damages.'" *Haul Trans. v. Morgan*, 1995 Ohio App. LEXIS 2240, *9 (2d Dist. June 2, 1995), quoting 18 Am.Jur.2d, Conversion, § 2, at 146-147 (1985).

**{¶21}** "'If a defendant comes into possession of property lawfully, a plaintiff must prove two additional elements: (1) that she demanded the return of the property after the defendant exercised dominion or control over the property, and (2) that the

---

[2] Although the trial court addressed a conversion claim by Janet in its judgment and found that she "failed to present any substantiated facts supporting her conversion claim," the memorandum in opposition to summary judgment made clear that Janet herself was not asserting a claim for conversion. ("As made clear by a reading of the Amended Complaint, and illuminated even further by a reading of Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss (filed on 8/19/2022), Plaintiff Janet Franz does not seek damages for conversion. Plaintiffs' conversion claims are based on monies and property converted from Sue Bruns.") Rather, she asserted that the joint claim was regarding the "monies and property" converted from Sue. In this regard, the trial court found that Janet lacked standing to assert any claims pertaining to Sue's property and this finding has not been challenged on appeal. Consequently, this assignment of error is being construed as a challenge to the trial court's judgment on Anthony's conversion claim only.

defendant refused to deliver the property to the plaintiff.'" *Whitt Sturtevant, LLP v. NC Plaza LLC*, 2015-Ohio-3976, ¶ 65 (10th Dist.), citing *RFC Capital Corp. v. EarthLink, Inc.*, 2004-Ohio-7046, ¶ 61 (10th Dist.).

**{¶22}** "These two additional elements are not required where a wrongful possessor has unlawfully acquired dominion over the property." *R&S Distrib. v. Hartge Smith Nonwovens, LLC*, 2010-Ohio-3992, ¶ 23 (1st Dist.). "But even if the original taking was lawful, 'should an act of dominion or control inconsistent with the plaintiff's ownership occur, a demand and refusal are not necessarily required.'" *Id.*, citing *Saydell v. Geppetto's Pizza & Ribs Franchise Sys.*, 100 Ohio App.3d 111, 125 (8th Dist. 1994).

**{¶23}** "'It is fundamental that a plaintiff in a conversion action must show title or rightful ownership of the chattel, including money, at the time of the alleged conversion.'" *Kodu*, 2016-Ohio-8020, at ¶ 22 (1st Dist.), quoting *Leven Corp. v. Aberth*, 1993 Ohio App. LEXIS 727, *7 (9th Dist. Feb. 10, 1993). "In keeping with this requirement, a claim for conversion of money will lie only when the money at issue is earmarked or is capable of identification, such as money in a specific bag or certain coins or notes that have been entrusted to a defendant's care." *Id.*, citing *Smith v. Boston Mut. Life Ins. Co.*, 2013-Ohio-2510, ¶ 11 (1st Dist.). "Further, the plaintiff must prove that there was an obligation to keep intact and deliver the specific, earmarked money rather than merely deliver a certain sum." *Id.*, citing *Smith*.

**{¶24}** "'[A]n action will not lie for the conversion of a mere debt or chose in action.'" *Haul Trans.*, 1995 Ohio App. LEXIS 2240, at *9 (2d Dist. June 2, 1995), quoting 18 Am.Jur.2d, Conversion, § 8, at 151 (1985). "'Consequently, where there is no obligation to return *identical* money but only a relationship of debtor and creditor, an action for conversion of the funds representing the indebtedness will not lie against

11

the debtor.'" (Emphasis added.) *Id.*, quoting 18 Am.Jur.2d, Conversion, § 8, at 151 (1985).

{¶25} As an initial matter, we note the limited scope of the argument on appeal pertaining to Anthony's conversion claims.

{¶26} The amended complaint asserts, "Beginning in 2009, and continuing through February 22, 2021, [Carole], acting directly and through her agents, wrongfully exercised dominion and control over Ned and Sue Brunses' assets, namely cash and valuable coins, and used those funds for the benefit of herself, Defendant Healthy Visions, which she controls, . . . and her immediate family members." Thus, the amended claim appears to include any alleged exercise of dominion and control of the Brunses' assets from 2009 until February 22, 2021, the day that Anthony was granted emergency guardianship over Sue.

{¶27} Thereafter, in discovery, plaintiffs identified a list of the alleged conversions in their interrogatory responses. This list was several pages long and spanned from 2011 to 2021. This list was relied upon in the motion for summary judgment, and the motion in opposition to summary judgment.

{¶28} Ultimately, the trial court granted summary judgment in favor of the defendants on the conversion claims without specifically addressing any of the alleged instances of conversion from the list in the record. Rather, the trial court found generally that Anthony failed to establish a "prima facie case" for conversion where he failed "to establish Defendants' conversion by a wrongful act or disposition of the Plaintiffs' property rights." The trial court's rationale was that, according to Sue's deposition testimony, the "payments and gifts" were voluntarily given and an "assertion that the Defendants used God as motivation to provide does not rise to the level of conversion." The trial court stated, "If this claim holds any validity, it implies

that every church across the globe would be guilty of the same wrongdoing." The trial court further found that, even assuming arguendo that Anthony could establish a prima facie case for conversion, the claim still fails as (1) any alleged conversion prior to March 28, 2018, is barred by the statute of limitations, (2) many alleged transactions were bank withdraws with no evidence indicating who received those payments, and (3) Sue admitted that she voluntarily provided for the defendants and the Adlard family and no demand was made for return of the money or property until Anthony assumed guardianship of Sue.

**{¶29}** Anthony now appeals, appearing to limit his claim of conversion to (1) theft of cash from Sue's Kentucky bedroom in March 2021, (2) "fraudulent theft" of Sue's ownership interest in a limited liability company ("LLC") in February 2021, and (3) theft of hundreds of personal property items in March 2021. Thus, as confirmed by counsel during oral argument, the conversion claim has been narrowed significantly on appeal from what was asserted below.

**{¶30}** First, we address the alleged theft of cash from Sue's bedroom. This claim derives from the assertion that $354,000 was withdrawn from Sue's bank account at Northside Bank in 2020 and early 2021 and taken to a property used by the prayer group in Kentucky. Three hundred thousand dollars of this money was allegedly left in Sue's bedroom when Sue left the Kentucky property and was later taken by prayer group members at Carole's direction.

**{¶31}** The Kentucky property was allegedly purchased by the Brunses in 2016 at Carole's direction and was updated to include, among other things, bedrooms for prayer group members, a large meeting room for the prayer group, a large storage barn, and "a massive underground bunker where prayer group members could hide under attack."

13

**{¶32}** In the list of property allegedly converted that was utilized in the trial court on summary judgment, 11 withdrawals are alleged to have occurred in 2020 and early 2021 from Sue's Northside Bank account: (1) $5,000 on May 11, (2) $9,000 on May 16, (3) $20,000 on June 3, (4) $25,000 on July 14, (5) $20,000 on August 4, (6) $25,000 on August 26, (7) $20,000 on October 8, (8) $40,000 on October 19, (9) $50,000 on December 8, (10) $40,000 on December 16, and (11) $100,000 on January 28, 2021.

**{¶33}** In support of these cash withdrawals, Anthony points on appeal to his affidavit submitted in opposition to summary judgment. In the affidavit, among other things, Anthony avers that, while serving as Sue's power of attorney, he "noticed that her bank account balance had declined significantly," so he "contacted Northside Bank and asked for statements for the account." Upon receipt of those statements, he "found" the above-listed withdrawals, which prompted him to petition for the guardianship of Sue.

**{¶34}** Over $300,000 of this money was allegedly stored in Sue's bedroom at the Kentucky property. In support of this assertion, Anthony points to Sue's deposition testimony on April 19, 2024. At the deposition, Sue was asked, "regarding cash withdraws" generally, whether she left any money behind at the property. She answered, "Yes." When asked how much, she answered, "There was at least $300,000." When asked where exactly the money was, she said, "In different parts of my personal space." When asked to answer "specifically," she replied, "In my cupboard amongst my clothes, my shoe bag. A lot of different places." When asked how many places, she said, "Four or five." When asked if "eventually" the money was returned to her, she said, "There was $4,000 still there or $40,000 still there. All the rest had disappeared." When asked "how much was left then," she replied, "Three

hundred and -- well, do the math."

**{¶35}** Jim (James) Strotman and Joe Fussner, prayer group members, are alleged to have searched Sue's bedroom and found the money, and "then turned all the cash over to Carole Adlard" at her direction. In support of this assertion, Anthony points to Jim's deposition testimony and Jim's affidavit submitted in opposition to summary judgment, as well as Joe's alleged admission in his deposition that he used funds taken from the bedroom to purchase approximately $112,000 in silver and gold coins.

**{¶36}** In his affidavit, among other things, Jim avers that the prayer group "all knew that the Bruns family had been the source of nearly all the money to keep the Prayer Group going and that Sue Bruns had made several withdrawals from her bank account." He claims that, in February 2021, they learned that the guardianship had been imposed, and Sue was "no longer at" the Kentucky property. He then avers,

> After the Probate Court had issued the guardianship for Sue Bruns, Carole Adlard, speaking as "God," decided that we had to leave "God's Land," and she arranged the lease of [another house] for the Prayer Group. Carole ordered that cash in Sue Bruns' room be collected, but I am not aware of the entire amount of cash that was collected from the room. I remember counting $140,000, which was taken at the instruction of and turned over to Carole Adlard. In late August 2021, I was ordered by Carole Adlard to return to the Kentucky property to put cash into Sue Bruns' clothing. I received $40,000 in cash with instruction that I should go to the Kentucky property, enter Sue Bruns' room, and stuff $40,000 in cash into the pockets of Sue Bruns' clothing. I followed these instructions.

After I returned from Kentucky, I spoke to Joseph Fussner about what I had done. During that conversation, I told him I was puzzled about the $40,000, because I had remembered counting out $140,000 when the cash was removed from Sue's room. He told me that he and Carole Adlard had split the remaining money (which I took to be $100,000) but decided to put $40,000 back into Sue's clothing.

**{¶37}** In his deposition, Jim testified that he and Joe were instructed by Carole to gather clothes and whatever cash Sue may have at the Kentucky property "so she could give it back." He stated,

So it's a day or so before leaving she is saying, Joe, you and Jim gather that together. Give it to Joe. Joe will bring it up to my house. And I will give [Sue] the money, and I will give her some clothes so she's got some clothes to wear -- as though she didn't have any clothes to wear -- but, you know, she's going to orchestrate that.

So we did that.

**{¶38}** He said they gathered all the cash they could find, which was $140,000, and then "it was given to Joe." Then, "Joe took it up to Carole Adlard's house, of which she was then going to take and give all that to Sue. My understanding was that didn't happen." He said,

This is March that happened.

In August, you posted the notice -- or your firm did, posted the notice on the fence, saying, you are to get out. You guys didn't know that we had left months earlier. You thought we might still be there. We were not. We locked up and never went back, until -- until that was posted on the -- on the fence. So you couldn't get in the property.

And before that, I had been given some things, some boxes, by Carole. So I went over to her house, had boxes, here's the -- you know, the money that, you know, you guys took out of there. We're bringing that back.

She said, put that in the kitchen. And so I took the boxes, put those back in the house. I got the -- the -- whatever it was that she had this money in, and I counted it. And there was only $40,000.

And I said – So I -- and I'm by myself at -- at London. So I -- I put it there. I knew now there's $100,000 that was not brought back.

I get to the house. A day or so later, Joe comes back to the house.

And I said, Joe, I said, you know that we took $140,000 out of the house. We counted it together. I said, I was told by Carole to take -- because -- and there was a -- there was some kind of renumeration of how much money was spent, that Carole -- and I'm telling you this. Carole, in many cases contrived it. She contrived that list.

. . .

So I go to Joe, and I said, Joe, you know that we took out -- took $140,000. You know that I only took $40,000 back. I -- I said, what happened to the other hundred?

He said, oh, Carole and I split it.

I said, you did what? You split it? You split it? How -- how can you do that? It wasn't your money. It was Sue's money. Sue and Ned had been so generous there. And you've got the gall to think it's okay for you and -- and it was Carole's initiative -- to say that it was okay for you two to split $100,000 that's not yours?

Oh, I was angry. Oh, my god, I was angry. I was going to confront Carole about it. And it wasn't that long after that I was booted out of the house. I think she also knew that I -- what I knew then. And I think she was finding a way to get rid of me.

{¶39} He later testified that he heard Carol instruct Joe to bring the money back to her house. He was asked, "So you were standing next to Joe when Carole said that?" He answered, "Yeah." He was also later asked where the $40,000 was "before he brought it back," and he answered, "Carole's house." When asked if he could say for sure that the $40,000 he picked up from Carole's house was the same money that was taken from the Kentucky property, he answered, "I don't think Sue -- or Carole, out of the goodness and kindness of her heart, is going to take $40,000 of her own money and give it to Sue."

{¶40} In his deposition, Joe was asked if Sue's personal belongings were ever removed from the Kentucky property, and he initially said that he could not recall anything being removed. However, he was then asked if he knew that Sue kept her cash at the property. He agreed that he was familiar with where Sue kept "one thing of cash that had a little bit in it," and said, "And that was there when I left for the last time." He testified, "Jim Strotman was there and he removed some stuff that final time, but I did not remove anything." When asked if he went through Sue's bedroom to collect cash, he answered, "I was there when Jim Strotman went through the master bedroom closet and found a lot of cash, but I didn't go through it myself." He said that he made sure "that one thing [of cash] [he] knew of Sue's was still there," and said, "That would have had 20-ish, maybe $40,000." When again asked if he touched any other cash in Sue's bedroom, he said, "As I recall, Jim Strotman's the one who found all the cash and took some of the cash off the property." When asked what happened

18

to the money after that, he said that, because Sue was worried about her finances being "shut off and locked," he "went ahead and held onto that money in hopes that Sue would get her freedom and [he] would have the money to give back to Sue." In other words, he agreed that he did "touch the cash" off the property but claimed he did not remove the cash from the property. Nevertheless, he also admitted that he used the money to "purchase some gold" that he still has possession of "in a secure spot in his apartment" since he never heard anything from Sue requesting the money back. When asked what amount of money was used to purchase the coins, he said, "As I recall, it was around a hundred thousand dollars." When asked if any cash was returned to the Kentucky property, he answered, "Not as I recall, no."

{¶41} Anthony argues that the trial court erred in granting summary judgment on this conversion claim involving the cash from the Kentucky property where the above testimony created genuine issues of material fact that precluded summary judgment. Defendants argue that the trial court properly granted summary judgment on the cash conversion claim where the cash at issue was not earmarked and/or is incapable of identification and thus cannot form the basis of a conversion claim. In support of this assertion, defendants point to *Haul Transp.*, 1995 Ohio App. LEXIS 2240 (2d Dist. June 2, 1995), and *Kodu*, 2016-Ohio-8020, at ¶ 22 (1st Dist.). However, neither case supports the proposition asserted by the defendants.

{¶42} In *Haul Transp.*, business relations began between two interstate trucking companies ("Haul and Schwerman") and a transportation company ("Morgan"). *Haul Transp.* at *2. Two agreements governed the relationship. *Id.* First, an agreement was entered wherein Morgan would lease tractors, trailers, and drivers to Haul. *Id.* Under this agreement, "Hall was to bill its customers and then remit a percentage of the revenues to [Morgan] as payment." *Id.* at *2-3. Second, an

agreement was entered wherein Morgan's brokerage division was to provide Haul and Schwerman with "'a minimum of one truckload of product per month' from its shipping customers, to be transported by Haul and Schwerman to or from one of [Morgan]'s facilities." *Id*. at *3. Morgan was also responsible under this agreement "for directly billing its shipping customers and then remitting payment to Haul and Schwerman for the transportation services they provided at an agree upon rate." *Id*. Problems ultimately developed under the brokerage agreement, some of which resulted in Morgan failing to remit any sums to Haul as required under the agreement. *Id*. at *3-4. Ultimately, Morgan's debt to Haul and Schwerman grew to $91,463.27. *Id*. at *4. After settlement negotiations were unsuccessful, both agreements were terminated by Haul. *Id*. Aware of the "worsening financial predicament," the president and sole shareholder of Morgan ("Morgan's president") "acted to protect his interest." *Id*. He established another transport company and a trucking partnership with his wife, which "took over the business operations" of Morgan. *Id*. at *5. Then, he began transferring Morgan's assets to third parties, himself, and the trucking partnership. *Id*. Morgan eventually was "forced" to institute bankruptcy proceedings. *Id*.

{¶43} Haul and Schwerman obtained a judgment against Morgan for the $91,463.27 in shipping fees owed to them. *Id*. Then, they brought suit against the president and his wife, seeking to hold them personally liable on the debt. *Id*. Among other things, they asserted a claim for conversion of the $60,644.86 that they received from Morgan's shipping customers under the brokerage agreement. *Id*. The trial court ruled against Haul and Schwerman on the conversion claim and they appealed. *Id*. at *6. Recognizing that an action alleging the conversion of cash requires *specific* money capable of identification, the court of appeals upheld the trial court's decision where

20

nothing in the brokerage agreement required Morgan to remit to Haul any portion of the *specific* monies it received from its shipping customers. *Id.* at *10-11. Rather, Morgan "could fulfill its obligation to Haul by paying money, generally." *Id.* at *11. The court said,

> When Morgan Transport received payment from its shipping customers, those specific monies became its property. Haul never had an ownership interest in these specific monies, and it never had a right to possess them. All Haul and Schwerman had was a right to collect payment on the debt Morgan Transport owed it. The relationship between the parties under the Brokerage agreement was merely that of a debtor and creditor; consequently, no action for conversion was possible in this case.

*Id.* Thus, the conversion claim failed where the claimants failed to prove that they held title or the right to possess the specific monies received by Morgan from its shipping partners. Here, Sue clearly held title or the right to possess the money held in her bedroom at the Kentucky property.

{¶44} In *Kodu*, 2016-Ohio-8020 (1st Dist.), two individuals met on a dating website. *Id.* at ¶ 3. They lived in different states and saw each other in person only twice. *Id.* During this time, one of the individuals, Kalarani, was "embroiled in post-divorce-decree proceedings." *Id.* Kalarani shared the details of her "legal problems" with the other individual, Kodu, and expressed that she was living paycheck-to-paycheck and owed $50,000 in legal fees, which—according to Kodu—she was very worried about. *Id.* Kodu offered to help. *Id.* First, he wired $2500 to Kalarani's mother's checking account for Kalarani to use to pay legal fees. *Id.* Then, he wired $4,000 to the same account and sent Kalarani two cashier's checks in her mother's

name, one for $11,000 and another for $5,000. *Id.* Kodu also made a direct payment of $5000 to an attorney on Kalarani's behalf and a direct payment of $1000 to the domestic relations court to cover guardian ad litem fees on Kalarani's behalf. *Id.* Finally, Kodu said that Kalarani talked him into a $15,000 loan "so that she could put a down payment on a condominium." *Id.* They later broke up, and Kodu sent "a series of texts" seeking immediate repayment of $15,000 plus payment terms "for the remaining balance." *Id.* at ¶ 4. Kalarani did not respond. *Id.* Kodu then emailed her and demanded immediate repayment of all the money. *Id.* Kalarani responded by telling Kodu to stop contacting her. *Id.*

{¶45} After Kodu drove to Cincinnati in an unsuccessful attempt to "reason" with Kalarani's parents, he sued. *Id.* At trial, Kalarani claimed that all but the $15,000 was a gift, and that Kodu never said that the remaining $28,500 was a loan until after they ended their relationship. *Id.* She further claimed that she repaid $14,000 of the loan. *Id.* Kodu on the other hand said that he offered to loan her the money to help and claimed that he told her the money was a loan. *Id.* at ¶ 6. The trial court awarded a judgment in favor of Kodu for fraud, conversion, unjust enrichment, breach of contract, and punitive damages. *Id.* at ¶ 2. Kalarani appealed. *Id.* This court ultimately reversed the entire judgment, except for the finding of liability on the breach-of-contract claim. *Id.* at ¶ 29. Relevant to our purposes here, this court addressed whether sufficient evidence was presented to prove conversion. *Id.* at ¶ 21. This court held that the judgment for conversion was not supported by sufficient evidence where "Kodu proved only that a certain sum was due." *Id.* at ¶ 23.

{¶46} Thus, similar to *Haul Transp.*, Kodu failed to show that he held title or the right to possess any *specific* monies. While *Kodu* is different from *Haul Transp.* in that the claimants in *Haul Transp.* never had a right to the specific monies alleged

22

to have been converted, Kodu nevertheless lost his right to the *specific* money given to Kalarani where he failed to prove any obligation to keep intact and deliver that specific money back to him. Here, there is no evidence to indicate that Sue lost her right to the *specific* money in her bedroom at any point.

{¶47} Thus, the instant case is different from both *Haul Transp.* and *Kodu* as the evidence, when viewed in a light most favorable to the plaintiffs, shows that Sue held title or the right to possess the money in her bedroom at the time that it was taken and she never relinquished that right to possession of those *specific* monies. In other words, this is not a situation, like a debtor/creditor relationship or contractual relationship, where the claimant can only show that a certain sum was due, rather than any specific identifiable monies. Instead, the money at issue is identifiable as the money that was present in Sue's bedroom at the Kentucky property that was taken by Joe and Jim and delivered to Carole at her request.

{¶48} Because the money is capable of identification and the evidence, when viewed in a light most favorable to the plaintiffs, shows that Sue held title or the right to possess the specific money at issue and this money was taken at the direction of Carole and given to her, with only $40,000 returned, we hold that summary judgment was inappropriate on this conversion claim against Carole as material issues of fact remain to be determined where Carole held possession of the cash under a claim inconsistent with Sue's rights. However, to the extent that this claim is asserted against Healthy Visions, we affirm the judgment of the trial court in favor of Healthy Visions as there is no evidence that Healthy Visions was involved in these alleged acts.

{¶49} Second, regarding the "fraudulent theft" of Sue's ownership interest in an LLC, Anthony asserts that Carole forced Sue to "sign over her ownership interest" in the LLC that owns the Kentucky property.

{¶50} In support of this argument, Anthony points to Sue's deposition testimony and claims that her testimony created a genuine issue of material fact on this claim. In the relied-upon testimony, Sue testified about Carole suggesting, on the morning she was "not allowed to go back down [to the Kentucky property]," that she should "sign something that would give Joe possession of the land if [she] wasn't able to come back." When asked if Carole provided her with any documentation during this discussion, she replied, "Yes. She had something... or did she? I don't remember. I think it was just word of mouth like, yes, Joe should take over if I'm not able to be there any longer." When asked to clarify if she was provided with anything to sign, she answered, "I think she did have me sign something, but it wasn't this because this is September. This is not my signature on this document."

{¶51} The document that she was referencing was an operating agreement from September 2020. This document, entered as an exhibit at the deposition, shows Joe as the sole member with a 100 percent ownership interest in the LLC that owns the Kentucky property. Sue testified—just prior to the above-stated testimony—that, although her signature appeared to be on this document, she never signed the document. Thus, she said that this document was not the document that she signed at the insistence of Carole.

{¶52} When further testifying about the document Carole allegedly had her sign before she left the property, she was asked if Carole "forced" her to sign it, and she responded, "She told me it was God's will that I sign it, yes." When asked if Carole "physically forced" her to sign it, she said, "Physically forced me, no." Further, when asked if she had any "thoughts" about Carole's suggestion that ownership should transfer to Joe, she said, "Yeah, because that's the way the original was set up, if something happened to me, Joe would take over." When asked why it was set up like

that, she said, "So that was just how we went looking for the place; and he was a member of the group, and it would all stay within the group." She was further asked if it was important to her and Ned that, upon either of their passing, the group would "still get to use the property," and she said, "Yes." She was then asked, "Is that why you signed the document you're referring to with Carole the day that you went up to Cincinati for the last time," and she said, "Yeah." She further answered, "Yes, because -- I don't know. It was very important that I do that, and she kept stressing that I should do that, and I did it."

**{¶53}** Even when viewed in a light most favorable to Anthony, this evidence is insufficient as a matter of law to show that Carole wrongfully exercised dominion and control over Sue's ownership interest in the LLC as it does not provide any information about what document Carole allegedly had Sue sign that day. Consequently, we overrule this part of the assignment of error and affirm the trial court's judgment in favor of defendants on the claim of conversion of Sue's ownership interest in the LLC.

**{¶54}** Lastly, regarding the "March 2021 theft of hundreds of personal property items," Anthony asserts that defendants "admit" that they took tangible property from the Kentucky property without Sue's knowledge or consent.

**{¶55}** In support of this assertion, he points to Joe's deposition testimony, as well as a May 13, 2024 letter from defense counsel to plaintiffs' counsel, which was attached as an exhibit to plaintiffs' memorandum in opposition to summary judgment.

**{¶56}** First, the letter was not incorporated into a properly-framed affidavit under Civ.R. 56(C) and it therefore has no evidentiary value for purposes of summary judgment. *See, e.g., Stites*, 2021-Ohio-3839, ¶ 12-14 (1st Dist.).

**{¶57}** Nevertheless, even if this court were to consider this evidence, all the letter states is that defendants would like "to facilitate the return of [certain] items to

25

[Sue], which were being held in trust for [Sue's] benefit, now that they have confirmed [Sue] is aware of the property and is to receive it." The letter does not establish the circumstances under which the items—including heaters, generators, batteries, food, furniture, and solar panels—were taken or establish who had possession or control of the items at the time of the letter. Rather, the letter simply states that the defendants wanted to "facilitate" the return of items, allegedly being held for Sue's benefit. This—in and of itself— does not establish that Carole had either possession or control of these items for purposes of a conversion claim.

**{¶58}** The letter also claims that the above-mentioned items are "in addition" to items "subject to the Probate Court's January 19, 2024 'Application to Release Funds to Guardian.'" The probate orders, included in the summary-judgment record, reference items—including certain coins, a lawnmower, a "Kawasaki 800cc TERYX4," a trailer, and solar equipment—"currently in the possession of Joseph Fussner." Carole is not mentioned in the probate orders.

**{¶59}** In his deposition, Joe testified about vacating the Kentucky property. He said, "Shortly after Sue was snatched, the emergency guardianship process started. I vacated the property very quickly after that." When asked if any personal property was removed from the Kentucky property at the time that he and other prayer group members vacated the property, he said,

> Shortly after Sue was snatched, we didn't know what was going to happen since Sue was inviting us to the property. So we all quickly left to go live in Hebron, as I said. And we all worked together with a couple moving trucks to move each one's individual personal stuff to moving trucks to move to Hebron.
>
> All along, which Ned and Sue made very clear, that this property

was a spiritual retreat center and a get-away place. That was Ned and Sue's original vision. And Ned and Sue are the ones who initiated it to keep it very quiet amongst everybody.

Ned specifically asked me not to tell any of my family about it, and I haven't told them since then. Because that was Ned and Sue's direction so I respected and honored that.

I've had a great relationship with Ned and Sue, so I honored that relationship -- or that friendship. And they made it clear to me over the years that any items that were on the property were for the prayer group that was there or in the future.

So some items got moved to some secure storage in the hopes that Sue would get her freedom. And our understanding that Ned and Sue wanted those to be part of the prayer group.

At one point Ned said that some of that stuff that he purchased was mine, so I was going off of what Ned said, and my understanding of what Ned and Sue wanted.

{¶60} When asked what prayer group property was taken, he replied,

I don't know if I could give a detailed thing just from memory. Ned and Sue bought some MREs and they said those were for the prayer group. It was my understanding that those were for the prayer group to use in the future. And now they're in a secure storage location.

{¶61} When asked if he recalled anything else being taken besides the "MREs," he said, "There was a Kawasaki ATV that's in a secured storage spot. There was a lawnmower that was part of that group that Ned said both of those -- he indicated both of those were mine after he bought them. That's just a verbal thing, so I can't prove

that, and maybe it's not – but that's what Ned said to me." When asked if he could recall any additional property that was removed, he said, "There may be more. I'd have to think for a bit to come up with a more exhaustive list. Of the top of my head -- I'm trying to recall anything else off the top of my head." When asked if any generators were removed, he answered that he could not recall. When asked if he had possession of any generators that were removed from the Kentucky property, he said, "There was some property that was removed that's in a secured storage location." He testified that the secured storage location is a storage locker in Blue Ash. He further testified that the ATV and the lawnmower are stored "at a secured friend's place." His friend's name is Melvin. He could not recall if any other property purchased by Ned or Sue was stored with Melvin. When asked who determined what property should be removed or what property should stay, he answered,

In the move out of the property, I was aware -- I dealt with anything that was mine to be moved off of the property.

Then after that, I helped assist with moving some of the things that was in the outbuildings, like the ATV and the lawnmower, based on what Ned and Sue had said, that those were for the prayer group moving forward.

So in their direction and my understanding of what they wanted, I moved those to Melvin Jones.

After that, I don't have any awareness of who was involved in any other decisions about what to move off or not.

{¶62} When asked if he received any instruction from anyone about what should be removed from the property and what should stay, he replied, "Not in that way, no. I was there when the movers moved boxes but not in the sense of what should

stay or shouldn't stay besides what I said earlier." He was then asked if he "solely made the decision to remove the property" that he testified to, and he said, "I was the one making decisions on the stuff in the outside thing based on -- as I said, Ned and Sue made it clear that that stuff was for the property, and the mystery of the LLC of -- if I was the owner of the LLC, was I the owner of that property? And there's that mystery." When asked if any of Sue's personal belongings were removed from the property, he answered, "Not that I'm aware. I don't recall because I wasn't involved in any of that." When asked to clarify whether he was involved in removing anything owned by Sue from the property, he replied,

> Well, in that sense it's different because the mystery of who --
>
> what's -- who owned the ATV and the Kawasaki and does it make sense
>
> that Ned and Sue's wish for that to stay with the prayer group is valid?
>
> So in that sense, yes. In the uncertainty of that.

**{¶63}** At most, the evidence establishes that Joe may have removed some of Sue's personal property from the Kentucky property of his own volition. However, Joe is not a defendant, and nothing in this testimony establishes that he was acting under the direction of Carole, or that Carole at any point had possession or control over the property.

**{¶64}** Consequently, even when viewing this evidence in a light most favorable to Anthony, this evidence is insufficient as a matter of law to show that Carole wrongfully exercised dominion and control over any of Sue's personal property that may have been taken from the Kentucky property. Consequently, we overrule this part of the assignment of error and affirm the trial court's judgment in favor of defendants on Anthony's conversion claim regarding Sue's personal property items at the Kentucky property.

**{¶65}** Based on the foregoing, we sustain the first assignment of error in part as to Anthony's conversion claim against Carole for removal of cash from Sue's Kentucky bedroom and overrule the remainder of the first assignment of error as to Anthony's claims of conversion against Carole for Sue's ownership interest in the LLC that owns the Kentucky property and Sue's personal property items that were at the Kentucky property, and any claim of conversion against Healthy Visions.

### C. Second Assignment of Error

**{¶66}** Under the second assignment of error, plaintiffs challenge the trial court's grant of summary judgment on their civil-conspiracy claim. Plaintiffs assert that the trial court erred in making its determination on this claim where the evidence of conversion established the necessary predicate act for conspiracy.

**{¶67}** "'Conspiracy has been defined as a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages.'" *S&T Bank, Inc. v. Advance Merchant Servs., LLC*, 2024-Ohio-4757, ¶ 58 (1st Dist.), quoting *Lefort v. Century 21-Maitland Realty Co.*, 32 Ohio St.3d 121, 126 (1987).

**{¶68}** "A civil conspiracy claim is derivative and cannot be maintained absent an underlying tort that is actionable without the conspiracy." *Meehan v. Mardis*, 2019-Ohio-4075, ¶ 46, citing *Doane v. Givaudan Flavors Corp.*, 2009-Ohio-4989, ¶ 32 (1st Dist.).

**{¶69}** The trial court found that the civil-conspiracy claim failed where it "is founded on the allegation of property conversion," and plaintiffs "cannot meet their burden of proof for the conversion claim."

**{¶70}** Because we are sustaining the first assignment of error in part as to the conversion of the money held in Sue's bedroom, we also sustain the second assignment

30

of error in part as to the conspiracy to commit the alleged conversion of money from Sue's bedroom as genuine issues of material fact remain to be determined on this claim. *See generally S&T Bank*, 2024-Ohio-4757, at ¶ 69 (1st Dist.), quoting *Meehan v. Mardis*, 2019-Ohio-4075, ¶ 47 (1st Dist.) ("All those who, in pursuance of a common plan or design commit a tortious act, actively take part in it, or further it by cooperation or request, or who lend aid or encouragement to the wrongdoer, or ratify and adopt the wrongdoer's act done for their benefit, are equally liable."). Therefore, we sustain the second assignment of error in part as to the allegation of conspiracy arising from money taken from Sue's bedroom but overrule the remainder of the second assignment.

### D. Third Assignment of Error

**{¶71}** Under the third assignment of error, plaintiffs challenge the trial court's grant of summary judgment on Anthony's claim for unjust enrichment.

**{¶72}** The trial court found that the unjust-enrichment claim "fails for various reasons." First, the trial court found that the matter "is not a breach of contract or quasi-contract." Additionally, the trial court found "the Bruns[es]' actions" were intended to be gifts "without expecting a return benefit other than possible admittance to heaven."

**{¶73}** Plaintiffs assert that "[u]ncontroverted evidence that appellee Healthy Visions received and retained money from [Sue] and the absence of intent by [Sue] precludes summary judgment on the unjust enrichment claims."

**{¶74}** However, in making this argument, plaintiffs fail to point to the record or set forth any specific money received and retained by Healthy Visions from Sue. Therefore, we hold that plaintiffs fail to meet their burden to establish error in the trial court's decision on this claim. *See Guthrie v. Guthrie*, 2024-Ohio-5581, ¶ 12 (1st Dist.),

citing *Olthaus v. Niesen*, 2023-Ohio-4710, ¶ 11 (1st Dist.) ("It is not the job of this court to develop or root through the record and relevant authorities to find support for a party's position."). Consequently, we overrule the third assignment of error.

### E. Fourth Assignment of Error

**{¶75}** Under the fourth assignment of error, plaintiffs challenge the trial court's grant of summary judgment on their IIED claims.

**{¶76}** "One who by extreme and outrageous conduct intentionally or recklessly causes serious emotional distress to another is subject to liability for that emotional distress." *FAP Props. XL, LLC v. Griffin*, 2022-Ohio-3410, ¶ 24 (1st Dist.), citing *Daudistel v. Village of Silverton*, 2014-Ohio-5731, ¶ 40 (1st Dist.).

**{¶77}** The trial court found that neither Janet nor Anthony could support a claim for IIED against Carole where "[n]either party provided evidence that [Carole] intended to cause serious emotional distress to either plaintiff through her actions." The trial court stated,

> [Janet] stated that she experienced heart problems related to stress caused by individuals other than [Carole]. Furthermore, neither plaintiff presented expert testimony nor medical reports to demonstrate that they experienced serious emotional distress. [Janet] specifically noted that her heart arrhythmia was a result of the stress from the lawsuit and actions by attorneys, not from [Carole] or any alleged conversion of property. Additionally, [Sue] admitted that she did not suffer any physical or emotional harm.

**{¶78}** Plaintiffs argue that the trial court's determinations on this claim were in error where "[Carole]'s conduct, and the effect that such conduct has had on [Sue] and [Janet], rises well above the conduct of other defendants found liable for IIED."

{¶79} Starting with Sue, Anthony points to the deposition testimony of Sue's alleged "treating psychologist," Timothy Sigward, Ph.D, in support of his argument.

{¶80} Dr. Sigward testified that he did an initial evaluation of Sue in March 2021. This assessment was done in connection with the guardianship proceedings and was provided in the form of a written opinion. He also completed a reassessment in 2023 that was needed for the guardianship proceedings. In conducting the assessments, he met with Sue, performed psychological testing, and reviewed emails "going back three years."

{¶81} Per Dr. Sigward's March 2021 written report, the initial assessment was to determine Sue's "ongoing competence to make good decisions on her own behalf." In the report, Dr. Sigward opines that Sue was,

> under the undue influence of an extreme religious group which has subjected her to significant emotional and psychological manipulation. Despite the fact that from a neurocognitive perspective she continues to exhibit generally intact cognitive functioning, and that there are no obvious psychological traits or characteristics which would make her more susceptible to the undue influence of others, the intense pressure and manipulation applied by the group has negatively impacted her decision-making capacity. Therefore, pursuit of guardianship of Mrs. Bruns in the opinion of the writer is appropriate.

{¶82} When summarizing his findings in support of his opinion, he states,

> Beyond the results of formal neuropsychological and psychological testing, this writer has some significant concerns about [Sue's] psychological well-being. Substantial evidence was presented to this writer which while not verified raises serious questions as to

33

whether or not she is subject to significant psychological manipulation by members of what might be described as a religious cult. This opinion is offered as a result of a careful review of the provided information, again which cannot be verified by this writer, as well as consultation with several psychologists with substantial experience dealing with and education in cult organizations. It should be noteworthy that individuals who become members of such groups often do not suffer significantly higher instances of psychological illness over the general population. Furthermore, there does not appear to be any particular psychopathology that is associated with cult involvement. On the other hand, individuals are subject to significant emotional and psychological manipulation by group members and, in particular, the group leaders. Such tactics often involve offering a perspective on the world as being a bad place, and indicating that the group is a refuge from this, therefore, one should become a member. Such a message is reinforced with frightening intensity involving repetitive prayer and meditation, constant social pressure to conform and comply with group messages, and a reinforcement of what might be considered paranoid ideation regarding the outside world. The evidence provided to this writer regarding Mrs. Bruns' involvement with this group seems to indicate the above noted ideology and tactics. Furthermore, there is evidence in the purported communications between group members and Mrs. Bruns of efforts to coerce, intimidate and threaten her (them) essentially with condemnation from God, including making the case that God considered them spending time with family as a sin for which God took

her husband's life. Furthermore, there are significant efforts obvious in the communications to separate her from her friends and family and ultimately to isolate her away from them. Finally, there appears to be substantial evidence of means to influence the forfeiture of her personal finances to them. Despite their not being an identified authority figure per the group's definition, there appears to be one individual, Carole, who describes herself as a mystic with special powers and ability to directly communicate with God as well as Mrs. Bruns' deceased husband. Furthermore, the use of such powerful figures such as Satan, and ideas including God's condemnation appear to have had a significant impact upon her emotional and psychological responding.

**{¶83}** Based, in part, on this report, the probate court deemed Sue to be incompetent in July 2021, "because of the terrible judgment that she [was] exercising." The probate court stated, "She is mentally impaired as a result of a mental disability that has occurred because of the significant and psychological manipulation of a 'Cult.' As a result, she is incapable of taking proper care of herself or her property." The court further stated, "In short, because of significant and psychological manipulation, a wealthy, vulnerable senior citizen is being exploited into exercising terrible judgment. [Sue] obviously misses her husband, and the "Mystic" exploits her feelings by telling her that the "Mystic" can communicate with him. Of course, money is involved."

**{¶84}** Further, in a letter from January 2024, Dr. Sigward states that he recommended in August 2023 that Sue's guardianship be extended due to "continued vulnerability and continued fragile psychological functioning primarily related to her previous experiences with a religious cult." In the letter, Dr. Sigward states, "When discussing her involvement with this group during our last meeting, she exhibited

palpable anxiety reflective of the likely trauma she had experienced, and expressed significant concerns regarding her continued vulnerability as well." He further opined that Sue testifying about her experiences around group members or a group representative "could not only trigger a substantial anxiety response in the moment, but could also lead to more lasting negative psychological consequences essentially eliminating any of the progress she has made thus far and perhaps leading to longer term psychological trauma."

**{¶85}** Even further, when discussing the 2023 assessment during his deposition, Dr. Sigward testified as to the changes in Sue from 2021 to 2023, and said,

> She was palpably anxious. She was -- you know, you could just see it on her face. She was very -- you know, while she was indicating that she was very satisfied with the current arrangement being back with her family even under the guardianship as it stood, the anxiety level shot up palpably when it was discussed about things that she has since learned between this date and when I saw her in March 2021 to the point where determining the guardianship, you know, I routinely would ask, you know, do you feel like the guardian -- does she feel like she still needs a guardian, and she said yes.

> And the reason was is [sic] because she felt extremely vulnerable and felt like without the protection of the guardianship, that -- and she couldn't articulate how this would actually happen, but that she was susceptible perhaps to making poor decisions that she had made before.

**{¶86}** When asked to clarify what he meant by palpable anxiety, he said "[Y]ou could see her face just kind of like droop. She was hesitant, you know, became very serious, and just appeared anxious."

{¶87} Beyond that, ample evidence in the summary-judgment record, when viewed in a light most favorable to the plaintiffs, supports that Carole presented herself to the group as a divine being and exerted significant influence over the prayer group.

{¶88} Consequently, based on the foregoing evidence, most particularly the finding of incompetence, and after a thorough review of the summary-judgment record, we hold that genuine issues of material fact remain as to whether Carole exerted psychological influence over Sue to the point that she caused Sue to suffer serious emotional distress.

{¶89} Next, we address Janet's claim of emotional distress. In support of her claim, she points to her own affidavit submitted in opposition to summary judgment. In the affidavit, she avers,

> The years of managing and attempting to counteract Carole Adlard's outrageous actions toward my family have taken a significant toll on my physical and mental health. This was especially true in the weeks following the institution of the guardianship of my mother. Due to Carole's years of programming my mother, I lived with my mother full time and worked to overcome the controlling hold Carole had over my mother. This culminated in a stress induced cardiac arrythmia which required emergency medical care in March of 2021 and daily pharmaceutical management since that time. An invasive cardiac medical procedure is also under consideration. Due to Carole Adlard's actions I have also suffered from symptoms of depression and anxiety including dysphoria and severe sleep disturbance. These medical conditions have impaired my daily functioning. I have continued to receive care for these conditions through the medical community both

formally and informally in the capacity of both a patient and a colleague.

Medical records reflecting these diagnoses are attached to this affidavit.

**{¶90}** The medical records attached to the affidavit support that she experienced a stress-induced cardiac event in March 2021 for which she went to the emergency room and received daily medication, as well as follow-up monitoring. The records also support that she experienced high stress, poor sleep, fatigue, shortness of breath, and "considered" counseling to help with "emotional issues due to stress." The records further indicate "dysphoric mood."

**{¶91}** Below, in arguing for summary judgment, defendants pointed to a portion of Janet's deposition testimony and argued that her distress was caused by attorneys and litigation, and not Carole. In the relied-upon testimony, Janet was asked, "So I'm clear. You are claiming that the arrythmia arose from the – your mother's rescue from the prayer group or as a result of your father's passing or a combination of the two?" She replied,

It is the significant amount of stress that was associated with Craig Matthews and Melanie Foran who were hired by the group. We fought to get guardianship of my mother so we could protect her. The prayer group fought to stop us from protecting our mother. One of the things they did was to hire a lawyer, Melanie Foran.

The day after that hearing where they came, there was a motion to intervene. That next day, Melanie Foran called my phone. She called my phone, and she left a message on my phone, I think, thinking that it was my mother's number, telling my mom that the judge had ruled that she could represent my mom and wanted to set up a meeting.

Carole and her group were using Melanie Foran as their in-

38

between for communicating with my mom. We have evidence to show that. We have a letter from Ed.

When I listened to that text message, I was in the front yard. I went down to the ground because I almost lost consciousness immediately. This was within a minute of listening to that.

Because with that happening, we were – we were afraid that we were no longer going to be able to protect my mom from their influences.

I went inside and was trying to act fairly normal because, again, I am at the time the only one at my mom's house to protect her. And I sat down at the kitchen table, and I almost started to pass out again, and my heart started to pass out again, and my heart started racing like it was coming out of my chest. And at that time, I'm like, oh, my God, I am having a heart attack.

And what do I do when I'm having a heart attack? If I call 911, my mom will be left alone because they will not take her in the ambulance, and she would probably leave. If I don't get to the hospital, though, immediately, I could die and orphan my children, and my husband would be widowed.

So as I'm sitting there with my heart pounding out of my chest, barely being able to maintain consciousness, I had to make a decision between getting to the hospital as fast as I can and saving my life or making sure that my mom was protected. It's not a decision that somebody should have to make.

So again – and I am in the process of trying to pass out during

this. I am in and out of like semiconsciousness, and I finally tried to say, okay, I've got to tap into my mom's instincts as a mother and beg her to drive me to the hospital in case I was having a heart attack or I was having a stroke.

And when we get there, I had to beg the people—this is during Covid. She drove me. We got in and I had to beg them. I said, She is an – she is an endangered senior, and she has to come back with me. And they pushed back. They wanted her to stay in the waiting room because it was Covid.

And I said, I can't stay here if she can't come back. So that's when I experienced arrythmia for the first time. It was associated with the stress of this.

**{¶92}** Ultimately, while this evidence may support that Janet suffered severe emotional distress in March 2021, the evidence is insufficient to connect the claimed emotional distress to any of the alleged extreme and outrageous conduct of Carole. Rather, the evidence, even when viewed in a light most favorably to Janet, shows—at most—that the conduct causing the claimed severe emotional distress was litigation after the fact. Consequently, we overrule the fourth assignment of error, in part, as it relates to Janet's claim against Carole for IIED.

### IV. Conclusion

**{¶93}** Based on the foregoing, we sustain the first assignment of error in part as to Anthony's conversion claim against Carole for money taken from Sue's bedroom in 2021, sustain the second assignment of error in part as to Anthony's conspiracy claim against Carole that is derivative of the bedroom-money-conversion claim, sustain the fourth assignment of error in part as to Anthony's claim against Carole for

IIED, and overrule the remaining parts of the first, second, and fourth assignments of error and the third assignment of error.

Judgment affirmed in part, reversed in part, and cause remanded.

**CROUSE** and **NESTOR, JJ.,** concur.